[No. B045402. Second Dist., Div. Five. June 25, 1991.]

DANA LENAHAN VAILL, Plaintiff and Respondent, v.
JAMES A. EDMONDS, JR., as Real Estate Commissioner, etc., Defendant
and Appellant.

**COUNSEL**

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Edmond B. Mamer and Jack T. Kerry, Deputy Attorneys General, for Defendant and Appellant.

Haight, Brown & Bonesteel, Roy G. Weatherup, Bruce A. Armstrong, Thomas N. Charchut, Jon M. Kasimov and Edward E. Vaill for Plaintiff and Respondent.

**OPINION**

**GRIGNON, J.**—The Commissioner of the California Department of Real Estate ordered the revocation of Dana Lenahan Vaill's license to sell real estate on the grounds that she violated Business and Professions Code section 10177, subdivision (g) by failing to disclose to buyers of a residence the existence of a dangerous geological hazard on the property and the events occurring at a meeting called by the County of Los Angeles to discuss this hazard. At the time of the events at issue in this case, Business and Professions Code section 10177 stated in relevant part, "The commissioner

may suspend or revoke the license of any real estate licensee . . . who has done any of the following: [¶] (g) Demonstrated negligence or incompetence in performing any act for which he is required to hold a license. . . ." Vaill petitioned for a writ of mandate in superior court. Applying its independent judgment to the facts of this case, the superior court found that Vaill had engaged in no conduct which could give rise to suspension or revocation of her license and vacated the commissioner's license revocation order. We conclude that the trial court's judgment is supported by substantial evidence.

PROCEDURAL BACKGROUND

*The Amended Accusation*

On October 10, 1986, the commissioner filed an amended accusation against Vaill containing two "causes of accusation." The first cause of accusation alleged grounds for suspension or revocation of Vaill's license under Business and Professions Code section 10176, subdivisions (a) and (i) (misrepresentation, fraud, or dishonest dealing). The second cause of accusation alleged that Vaill violated Business and Professions Code section 10177, subdivision (g), in that, as a real estate salesperson, she was negligent or incompetent in connection with the sale of a house in 1983.

In April of 1982, Vaill, in her role as a salesperson, negotiated the sale of a residence at 20279 Inland Lane in the Big Rock Mesa area of Malibu.[1] Acting as the agent of the seller, Vaill negotiated the sale of the property to John and Nancy Hudson, and on March 15, 1983, escrow was opened. Vaill resided on Inland Lane near the home the Hudsons were purchasing.

Vaill received a letter dated March 28, 1983, addressed to her as a property owner from the County of Los Angeles, Department of County Engineer Facilities. The letter referred to a "serious and potentially hazardous condition" in the Big Rock Mesa area of Los Angeles County. The condition consisted of "the alarming rate of rise of the ground water." The letter indicated that "unless the high ground water table is kept down by artificial means serious damage may occur." The letter invited the property owner to a meeting on April 12, 1983, at 7:30 p.m. in the Malibu Civic Center Library.

Vaill attended the meeting mentioned in the letter dated March 28, 1983. At the meeting, a "County engineer discussed, *inter alia*, the danger of land movement caused by high ground water" (original italics) in the Big Rock Mesa area. At the April 12, 1983, meeting Vaill signed a document requesting the establishment of a "County Service Area" to deal with the high

---

[1]The facts in this section are taken from the facts alleged in the amended accusation.

groundwater problem. The escrow on the sale of the property to the Hudsons closed on May 3, 1983. By January 1984 the property became so unstable that the Hudsons were compelled to move.

The amended accusation alleged that Vaill was negligent or incompetent in four respects. First, after the escrow was opened on March 15, 1983, Vaill "failed to inform" the Hudsons "that she received the March 28, 1983, county letter." Second, Vaill was alleged to have been negligent or incompetent for failing to have informed the Hudsons that she attended the April 12, 1983, meeting "in which the danger of land movement in the Big Rock Mesa Area and the need for a County Service Area or Special Assessment District to help solve the problem was discussed." Third, Vaill failed to notify the buyers of the property that landslides had occurred "only two houses from the [] property . . . at three different time periods during the 1970's." Finally, Vaill failed to notify the buyers that she, as a nearby property owner, had "attended meetings of and contributed money to the Malibu Mutual Drainage Company, an entity whose purpose was operating water pumps in the Big Rock Mesa Area to alleviate potential problems of land instability in the area."

### The Commissioner's Decision

After a hearing, an administrative law judge determined that Vaill did not commit "fraud, negligence, or incompetence on the facts and law of this case." The commissioner rejected the administrative law judge's findings and concluded that Vaill had been negligent or incompetent within the meaning of Business and Professions Code section 10177, subdivision (g). Specifically, the commissioner concluded that Vaill negligently or incompetently failed to advise the Hudsons concerning groundwater levels and future costs which would be incurred in connection with the necessity of removing the groundwater. The commissioner concluded that her negligence or incompetence constituted a ground for suspension or revocation of her salesperson's license pursuant to Business and Professions Code section 10177, subdivision (g). As a result, the commissioner ordered revocation of her license and authorized the issuance of a restricted real estate salesperson's license pursuant to Business and Professions Code section 10156.5.

### The Petition for Writ of Mandamus

On February 23, 1989, Vaill petitioned the superior court for a writ of mandate compelling the commissioner to vacate his order revoking her real estate saleperson's license. The superior court issued an alternative writ of mandate and set the matter for hearing. The superior court heard argument

on the motion on July 26, 1989. The superior court ruled that the independent judgment test applied and, thereafter, took the matter under submission. On October 13, 1989, judgment for Vaill was entered. The superior court issued a peremptory writ of mandate directing the commissioner to vacate his order revoking Vaill's license and enter a new order dismissing the accusation against Vaill with prejudice.

The commissioner timely appealed from the judgment of the superior court.

## FACTS[2]

In 1982, John Hudson and his wife Nancy began to look for a home to purchase in Malibu. The Hudsons were shown a home on a bluff on Inland Lane in the Big Rock Mesa area of Malibu by Vaill and another real estate agent, Donna Stewart. The Hudsons decided to make an offer on the Inland Lane property after viewing it three or four times with Vaill and Stewart. After some negotiation over the selling price, the Hudsons entered into an agreement to purchase the property in February of 1983.

During one of their visits to the property, Vaill told the Hudsons that one of the neighboring houses, owned by the Escobals, had a problem with water on the property and the Escobals had installed a pump to handle the problem.[3] The Hudsons could see water from the Escobal pump draining from a pipe at the end of the driveway of the property they wanted to buy. Vaill told the Hudsons that the Escobals had suffered a landslide in 1971. Stewart encouraged the Hudsons to discuss the geology of the area with their nephew, a developer who had built several homes on Inland Lane.

Vaill provided the Hudsons with a copy of a 1972 geological report (the Merrill Report) regarding the property the Hudsons were interested in buying. The Merrill Report stated that, according to county engineering records, part of the property "lies within an ancient landslide," but that the lot seemed to be stable based on soil tests and geologic analysis. The Merrill Report noted that horizontal drains had been installed, but that the continual rise in groundwater due to housing development on the mesa had "caused a number of new springs and seeps in the face and toe of the seacliff, along with several landslides." The report concluded, "[g]roundwater buildup in

---

[2]These facts are a synthesis of the testimony and evidence presented before Administrative Law Judge Richard E. Ranger.

[3]The Escobals later testified at deposition in connection with this matter that they had spent $250 per month for electricity to run the pump and additionally, $8,000-$10,000 to install and maintain the pump over a period of years. This information was not previously known to Vaill.

Big Rock Mesa is expected to continue as long as private disposal systems are utilized. Locally slope deterioration has resulted, and may do so in the future." It noted that the mesa might "deform plastically with resulting damage to structures" in an earthquake. The report stated: "The possibility could be minimized through installation, and connection of all dwellings on Big Rock Mesa to public sewerage. It is understood that some of the Big Rock Mesa owners have formed an association ostensibly to drain the groundwater, but their efforts to date are unknown." John Hudson read the Merrill Report, and despite its references to landslides and groundwater buildup, it did not cause him to be concerned about the property.

Upon the urging of Vaill and Stewart, the Hudsons hired a firm to produce a current geological report of the property. The purpose of this second report (the Byers Report), dated March 10, 1983, was "to evaluate the existence of any obvious geologic hazards on the site and visually assess the stability of the property," prior to the Hudsons' purchase of it. John Hudson intended to participate in this visual inspection but had difficulty reaching the property via the Pacific Coast Highway, which was closed due to a landslide just east of the property. Hudson arrived for the inspection very late due to the Pacific Coast Highway landslide. The geologist told Hudson about the steady erosion on the property, but this did not seem to trouble Hudson, who joked that he would be dead before the bluff eroded all the way to the house.

The Byers Report stated that a steep slope at the end of the property dropped 175 feet down to the Pacific Coast Highway, and "is locally eroded and exhibits signs of surficial instability," its upper portions are "blanketed by weathered bedrock, soil, and colluvium which are subject to erosion and surficial failure upon saturation and during periods of intense rainfall." Like the Merrill Report, the Byers Report confirmed that "[h]igh groundwater is known to exist in the Big Rock area," and that drains were used to dewater the hillside. The report noted that the house itself did not show signs of cracking or distress, concluding that the property had performed well to date, and that the risk of erosion and instability could be minimized by improved drainage control. The report provided that modifications or improvements to drainage facilities should be made as necessary. It stated: "It should be pointed out that hillside properties are subject to potential hazards not found in conventional flatland developments. These hazards include floods, mud-slide, erosion, ravelling of slopes and concentrated drainage. The potential damage of these hazards can be greatly reduced by maintenance of slopes and drainage facilities. It is the responsibility of the hillside homeowner to maintain his or her property and to improve any deficiencies found during occupancy of the property." John Hudson believed the Byers Report gave the property a "clean bill of health."

The only earth movement problem Vaill was aware of was suffered by the Escobals, who told her they had lost an automobile in a landslide. Vaill told the Hudsons about this slide. The Hudsons revealed, when they were first looking at the property, that they were warned of the geological hazards and wanted to see a geological report, at which point she provided them with the Merrill Report. They informed her that they would definitely obtain their own geological report as well and did not want escrow to open until they had obtained the report.

The sellers of the property discussed the erosion problem with John Hudson, who seemed unconcerned, and showed him that the fence at the back of the yard had fallen down the cliff face. They also discussed the high groundwater problem suffered by the Escobals, who resided two doors down the street. In addition, the Hudsons were curious to know why the swimming pool was in front of the house instead of behind the house near the bluff and the sellers told them it was because there was a geological fault running across the back of the property.

The Hudsons opened escrow on March 16, 1983, after receiving the Byers Report. Subsequently, a home inspection report was produced by a company hired for this purpose. Again, nothing in this report concerned the Hudsons. The title insurance policy for the property issued on March 30, 1983, indicated that a portion of the land "is designated as 'geological hazard area'" on the tract map. The Hudsons thought this meant they could not build on the portion of their land closest to the bluff. The title insurance policy also stated that the Malibu Mutual Drainage Company had the right to levy certain drainage maintenance charges as assessments against the property.

While the property was in escrow, Edwin G. Biddlecomb, the regional engineer for the Los Angeles County Department of County Engineer Facilities, sent a letter dated March 28, 1983, to approximately 100 residents of lower Big Rock Mesa. The letter stated:

"The Los Angeles County Engineer's office has been made aware of a serious and potentially hazardous condition relating to the lower Big Rock Mesa area of Malibu. This condition is the alarming rate of rise of the ground water level in this vicinity. [¶] Recently, the Los Angeles County Flood Control District has encountered problems in repairing and replacing storm drains conveying storm waters from the mesa to Pacific Coast Highway. Twice concrete pipes draining Inland Lane have been destroyed by landslides. Presently a temporary above ground flexible conduit anchored by cables now takes care of the drainage. The bluff area is subjec[t] to continuous sliding and sloughing, and unless the high ground water table is kept

down by artificial means, serious damage may occur. [¶] In order to protect necessary drainage facilities, the access roads and basically the entire mesa area, it is necessary to lower the ground water level on a long term basis. As a property owner on the affected mesa area, you are invited to a public meeting to be held at the Malibu Civic Center Library Meeting Room, 23519 West Civic Center Way, Malibu, on April 12, 1983 at 7:30 p.m. At this meeting specific information on the nature, extent and significance of the problem will be discussed by engineers and geologists from this Department and the Flood Control District. We will also explore solutions to this problem, including the possible formation of a County Service area."

The county sent a copy of the letter to Vaill, who had lived since 1974 on Inland Lane a few houses from the property the Hudsons were buying. She did not receive this letter. Numerous instances of mail being stolen by children in the neighborhood were reported. Vaill knew nothing of the meeting until a neighbor asked her for a ride immediately prior to the meeting. Vaill attended the meeting with her neighbors. Vaill had no opportunity to invite the Hudsons to the meeting. No one else told the Hudsons about the letter or the public meeting.

The meeting was held on April 12, 1983. In attendance were Art Keene, head engineer-geologist for the county, Mike Johnson, flood control district geologist, Armando Cid, division engineer, Biddlecomb and an estimated 30 homeowners. The purpose of the meeting was to give information to the homeowners about the groundwater problem and to advise them of their available courses of action. At the meeting, the homeowners were advised that they should take action to combat groundwater problems. A county geologist noted at the meeting that when the ground in the mesa became saturated, it was very prone to landslides and, in 1972, the groundwater level rose to the surface along Inland Lane, causing a landslide. He stated that "the high ground water problems affect the entire area," and that if surface water were not controlled, erosion would increase affecting homes on the bluff.

It was noted that in the mid-1970's, the county had disclaimed any liability for the groundwater problems in the area. Because the county feared that any action might make them liable for damages, it had vetoed the establishment of a county maintenance district or a small improvement district. Just recently, the county had undergone a change of heart and was willing to help the homeowners establish some type of assessment district.

The homeowners were advised that a geologic hazard abatement district was a possible solution. This type of district is apparently formed in the

following manner: owners representing 10 percent of the assessed valuation of the property in the area request that the county initiate proceedings to establish an abatement district. Some initial investment of money is required in order to obtain a geologic report. Alternatively, the board of supervisors may initiate the proceedings on their own motion without any initial investment by the homeowners. All homeowners are notified of the proposed district, public comment is received, oral statements are heard, and a vote is taken. Owners representing 51 percent of the assessed valuation must vote in favor of the district before it could be formed. If a district were formed, it would have taxing and eminent domain powers.

The homeowners were also advised that the county could establish a county service area to take care of the groundwater problems. Under this scenario, the county would perform the necessary work and assess the property owners. It was also discussed that the homeowners could hire the county to take care of the problem and pay the county with voluntary contributions. The voluntary contribution method had been used previously during the period the Malibu Mutual Drainage Company was in existence.

Cost estimates were made, in response to questioning, ranging from a low of a few thousand dollars to simply restart the three existing pumps to $110,000 for new hydraugers, lines, and observation wells to a high of $10 million. Head Engineer-Geologist Keene stated: "I'm stating the plan that costs $110,000 there is more than you need! All you've got to do today is start to pump existing wells and get on a minimal program and use common sense!"

After the meeting two sign-up sheets were available, one was entitled "Big Rock Mesa Ground Water Problem" and the other "We the Following Are in Favor of County Service Area-Big Rock Mesa." Vaill signed both sheets. Homeowners who attended the meeting did not come away from it feeling that their homes were in any danger "whatsoever" of damage or that there was a "panic situation." Vaill did not disclose what transpired at the meeting to the Hudsons. Vaill felt the only point of the meeting was to tell local homeowners to reactivate the dewatering pumps which had been installed many years earlier, but whose operation was not funded. During the meeting, Vaill stood up and expressed concern to the county geologists and engineers that there was an active slide between Big Rock and Topanga Canyon that might close off the Pacific Coast Highway.

The meeting did not cause Vaill to be concerned about her own home on Inland Drive or the property the Hudsons were buying. She thought any concerns were sufficiently addressed by: (1) the geologist hired by the

Hudsons, who, she believed, would research county records and reveal in his report any landslide occurrences; (2) the Merrill Report which mentioned the groundwater problem; (3) her discussions with the Hudsons about the Escobals' dewatering efforts; and (4) the title report which referred to the property as being in a geological hazard zone. She did not feel she had sufficient knowledge of the geology of the area to advise the Hudsons further on the subject.

Escrow closed on the Inland Lane property in May of 1983. Two months later, tiles began to crack inside the Hudson house. In September, an enormous crevice, 14 to 15 feet deep, opened up in the bluff-facing side of the Hudsons' yard, and cracks appeared throughout the house. At a public meeting that month, regarding the earth movement in the area, a neighbor, Gayle Escobal, told Nancy Hudson that Vaill had failed to give the Hudsons full disclosure about the property, which was known for years to be unstable.

In January of 1984, the Hudsons invited a county geologist to their home to find out if they could safely continue to live there. He told them the house was subject to a landslide and that the damage would continue. Based on this, the Hudsons immediately moved out of the house. The property was condemned by the county, and its appraised value dropped to zero. This prompted the Hudsons to institute a civil lawsuit against the real estate agents and brokers, geologists, sellers, the county, and others over the loss of their house.

The Hudsons testified that during the short period of time they resided on Inland Lane, they first became aware of the groundwater danger when someone dropped a flyer in their mailbox after they moved into the home. They both testified that they contributed $1,500 to a local homeowners group to support dewatering efforts on the mesa. They also testified they would not have purchased the house if they had been aware of a groundwater or landslide danger.

### DISCUSSION

*Standard of Review*

The right to practice one's profession is a fundamental vested right and if a person's license to practice that profession is revoked by an administrative agency, when a petition for a writ of mandate is brought for restoration of the license, the trial court must apply its independent judgment to its review of the facts underlying the administrative decision. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 144-146 [93 Cal.Rptr. 234, 481 P.2d 242];

*Drummey* v. *State Bd. of Funeral Directors* (1939) 13 Cal.2d 75, 85 [87 P.2d 848].) The trial court correctly applied the independent judgment test in this case.

Under the independent judgment rule, the trial court must weigh the evidence and make its own determination as to whether the administrative findings should be sustained. When an appeal is taken from the trial court's determination, it is given the same effect as any other judgment after trial rendered by the court: the only question is whether the *trial court's* (not the administrative agency's) findings are supported by substantial evidence. (*Petrucci* v. *Board of Medical Examiners* (1975) 45 Cal.App.3d 83, 87 [117 Cal.Rptr. 735].) Conflicts in the evidence must be resolved in favor of the judgment and where two or more inferences can be reasonably drawn from the facts, the reviewing court must accept the inferences deduced by the trial court. (*Anderson* v. *Latimer* (1985) 166 Cal.App.3d 667, 670 [212 Cal.Rptr. 544].)

*Substantial Evidence Supports the Trial Court's Findings in This Case as to Vaill's Warnings Concerning the High Water Table and Instability of Big Rock Mesa*

The Commissioner contends that Vaill was negligent or incompetent for failing to advise the Hudsons of the existence of geological hazards associated with the Inland Lane property. However, as to the problems caused by the high water table with the resulting danger of earth movement, we determine that substantial evidence supports the trial court's findings that Vaill was neither negligent nor incompetent in regard to her advice as to those hazards. First, the Hudsons themselves saw the Escobal pump draining water and were told, as John Hudson testified, that the Escobals had "a problem with water on the property," and had experienced a landslide in 1971. Thus, from the time of the Hudsons' initial contact with the property, they were aware that neighbors two lots down the street had "water problems." Nevertheless, at no time prior to the close of escrow did the Hudsons attempt to communicate with the Escobals regarding the nature and extent of the landslide and groundwater problem or the costs of ameliorative measures.

Second, the high groundwater problem was confirmed in writing in both the Merrill and the Byers geological reports. The Merrill Report disclosed that development on the mesa, accompanied by the use of septic tanks, caused a continual rise in the groundwater, leading to several landslides and slope deterioration. Significantly, the Merrill Report warned of continued deterioration "in the future." The Byers Report commissioned by the Hudsons reconfirmed the groundwater problem in Big Rock Mesa, noting that

drains had been installed in the hillside to remedy the problem. This report also warned that hillside properties were subject to mudslides, erosion, and drainage problems. Vaill not only gave the Hudsons the Merrill Report, she also recommended that the Hudsons secure their own report. They followed Vaill's advice and the Byers Report was then prepared.

Third, the groundwater problem was disclosed to the Hudsons yet another time by the sellers of the property, who also showed the Hudsons that a fence on their property had tumbled down the face of the bluff due to erosion. The sellers also disclosed that their swimming pool could not be built in the backyard because there was a fault running through that area.

Fourth, the existence of the fault was substantiated in the title report received by the Hudsons during escrow. The title report reveals that part of the property is in a "geological hazard area."

Fifth, Vaill affirmatively disclosed to the Hudsons both the groundwater and the landslide problems suffered by the Escobals. There is no evidence that there were groundwater or landslide problems peculiar to the property bought by the Hudsons which Vaill failed to disclose. The record also shows that Vaill urged the Hudsons to obtain their own geological report and they told her they were aware of the geological hazards of the area.

The commissioner places excessive importance on the letter announcing the April 12 public meeting. The unrefuted testimony regarding the letter was that Vaill did not receive it. There is no evidence that Vaill had possession of the letter at any time during the pendency of the Hudson escrow. Her own testimony constituted substantial evidence that she was neither incompetent nor negligent for failing to discuss a letter she never saw.

As for the meeting itself, in terms of the issue of high groundwater, it merely reiterated that the entire area had a groundwater problem which required activation of existing pumps. The tenor of the meeting did not convey a sense of urgency in terms of rising water levels and future earth movement. The April 12 meeting attended by Vaill did not impart any new information that had not already been disclosed to the Hudsons previously concerning high groundwater.

There is no evidence that any person involved in this transaction—the geologists Merrill and Byers, the sellers, the neighbors, even the county— anticipated that the property would suffer geological failure within a few months after the Hudsons purchased it. The commissioner argues that Vaill,

who is not a geologist or engineer, should somehow have anticipated the 1983 earth movement and warned the Hudsons of it. This requirement of prescience is too much to impose even on a geologist. A more reasonable construction of the licensing statutes would require Vaill to provide the Hudsons with existing geology reports, to urge them to commission their own independent geologist, and to disclose the groundwater and landslide problems suffered by a neighbor. There is substantial evidence she did all of these things.

The facts of this case are far different from those described in the case relied upon by the commissioner, *Easton* v. *Strassburger* (1984) 152 Cal.App.3d 90, 99-100 [199 Cal.Rptr. 383, 46 A.L.R.4th 521]. In *Easton*, the plaintiff purchased a property without any awareness of a soil problem or past slides, although the defendant real estate agents should have been alerted to potential problems and recommended a geological test. The property subsequently slid and was seriously damaged. The jury found liability for fraud and negligence and the Court of Appeal affirmed. By contrast, in this case the Hudsons were alerted to potential problems by the geological reports, which alluded to high groundwater and past and future landslides, and by Vaill's statements regarding the Escobal property.[4]

*Substantial Evidence Supports the Trial Court's Findings in This Case as to Recommendations of the County Representatives and the Potential Cost of Managing the Groundwater Problem Disclosed at the April 12, 1983, Meeting*

We have previously concluded that there is substantial evidence the information relating to dangers of high groundwater and the associated risk of landslides were conveyed to the Hudsons. We have also previously concluded that the April 12 meeting, attended by Vaill, did not impart any new information that had not already been previously disclosed to the Hudsons, concerning high groundwater.

■ The commissioner contends, however, that there is no substantial evidence to support the trial court's implied finding that Vaill was not negligent in failing to apprise the Hudsons of the other matters which were discussed at the April 12, 1983, meeting. Specifically, the commissioner argues that Vaill should have disclosed to the Hudsons: (1) that the county

---

[4]Another "critical" issue discussed by the commissioner need only be discussed briefly. It regards the Malibu Mutual Drainage Company (MMDC), an organization which formerly operated dewatering pumps on the mesa, but was disbanded in 1975. The MMDC had previously been funded by voluntary contributions from homeowners. Inasmuch as the disbanding of the drainage company had no apparent effect on the mesa after 1975, there is no reason why Vaill needed to discuss it with the Hudsons in 1983.

was disavowing any liability for the rising groundwater levels in the area; (2) that the county was recommending that a geologic hazard abatement district be established; and (3) the potential costs of such a district. We disagree.

Vaill is subject to suspension or revocation of her license if it is found that she has demonstrated negligence or incompetence in performing any act for which she is required to hold a license. (Bus. & Prof. Code, § 10177, subd. (g).) As a real estate agent representing the seller she is required to disclose to the buyer facts which would materially affect the value or desirability of the property. (Civ. Code, § 2079.) In this case, it is undisputed that a failure to disclose the high groundwater level and the risk of landslides associated with the property would constitute a failure to disclose a material fact resulting in a finding of negligence. (*Easton* v. *Strassburger, supra,* 152 Cal.App.3d 90.) We have concluded, however, that this information was adequately disclosed to the Hudsons.

We must decide, therefore, whether the failure to disclose the other matters which were discussed at the April 12 meeting was negligent and material. We conclude that substantial evidence supports the trial court's implied conclusion that the nondisclosure was not negligent and not material.

It is clear that the gravamen of the Hudsons' complaint was that Vaill had failed to disclose the high groundwater level and landslide risk. They stated that had they known of these dangers, they would not have purchased the property. The evidence establishes, however, that they were apprised of these dangers and nevertheless determined to buy the property. It is precisely these ignored dangers which resulted in the loss of the property by the Hudsons.

As to the April 12th meeting, the evidence establishes that the Los Angeles County Flood Control District had recently been experiencing problems in repairing and installing storm drains to control surface water running off into the Big Rock Mesa area. These problems were due to the high groundwater in the area. The flood control district conveyed information concerning the high groundwater to the Los Angeles County Engineer's Office, which thereafter notified the homeowners of a public meeting. The purpose of the meeting was to discuss the necessity of lowering the groundwater level and to explore solutions to the problem.

It is not correct to state that at the meeting, the homeowners were advised that the county was suddenly disavowing any liability for groundwater problems. In fact, the county had consistently disavowed any liability for the groundwater problems since the mid-1970's and had precluded earlier attempts to form property owner assessment districts in the fear that any

involvement on its part might make the county liable for damages. At the meeting, the homeowners were advised that the county had shifted course and would now agree to assist the homeowners in solving the groundwater problems.

County engineers suggested some possible mechanisms to resolve the long-standing groundwater problems, including geologic hazard abatement districts, county service areas, and voluntary contributions by homeowners. The engineers explained the procedure for establishing each of these mechanisms and offered the county's assistance. A reasonable inference may be drawn that the implications of the meeting were entirely favorable to the homeowners. The information provided established that finally steps might be taken to resolve a long-standing problem. Assuming knowledge of the groundwater problem in Big Rock Mesa, disclosure of what occurred at the meeting could only positively affect the value and desirability of properties in the area. Moreover, the discussions were nonspecific and suggested resolutions which could require a vote of the majority of the property owners to be successful. Importantly, no decisions were or could be made at the meeting which would affect the Hudsons' property.

Neither were the discussions of potential costs a negative factor which needed to be disclosed. As noted, the discussion of costs ranged from a few thousand dollars to millions of dollars. The most likely cost figure was thought to be less than $110,000 (approximately $1,100 per homeowner), hardly a substantial amount. The Escobals had individually spent much more than that on their own property in connection with the groundwater problem. Moreover, the Hudsons were already on notice by virtue of the Merrill and Byers Reports, that additional costs to control the groundwater problem would most likely be necessary. The costs involved in an assessment district, which would be distributed among all the homeowners, would most probably be less than any individual solutions. An area-wide solution would also most probably be more effective than individual solutions. Thus, the trial court may have properly inferred that disclosure of the cost estimates discussed at the April 12th meeting would have encouraged the Hudsons to proceed with the purchase and did not negatively and materially affect the value or desirability of the property.

Finally, the information provided at the meeting, even if viewed as negative, could not have been material to the Hudsons. Not every instance of nondisclosure is material. Whether the undisclosed matter is of sufficient materiality to affect the value or desirability of a property depends on the facts of the particular case. Here, the receipt of such information would not have affected the Hudsons' decision to buy the property. Knowing that the

high groundwater level and landslide risk were existent, they nevertheless determined to buy the property. Knowing the existence of the groundwater problems, it can also be presumed that they knew they might incur some expense in resolving the problem. Both the Merrill and Byers Reports informed them that they would incur some expense. Therefore, it is not reasonable to assume that if they had known additionally that the county was recommending the formation of an owners organization and that certain costs were associated with the establishment of such an organization, they would have then determined not to purchase the property.

DISPOSITION

The judgment is affirmed. The request for sanctions is denied. Dana Vaill is to recover her costs on appeal from James A. Edmonds, Jr., Real Estate Commissioner of the State of California.

Ashby, J., concurred.

**TURNER, P. J.**—I respectfully dissent.

Although there is substantial evidence the dangers of high groundwater and the associated risk of landslides were conveyed to the Hudsons, several facts are undisputed concerning the April 12, 1983, meeting which relate to the county engineers' recommendations that a special assessment district be formed and the costs of future groundwater pumping. Despite the fact that she never received the March 28, 1983, letter, Dana Vaill (Vaill) attended the April 12, 1983, meeting with a neighbor. The meeting was conducted by representatives of Los Angeles County in the Malibu Library, a county building. Among the representatives of county government who were present was Edwin Biddlecomb, regional engineer for the department of county engineer facilities in the Malibu region, Armando Cid, division engineer for the regional offices division of the county engineer department, Art Keene, head engineer and geologist for the county engineer department, Mike Johnson, a geologist with the flood control district, and Peter Ireland, a deputy to Supervisor Dean Dana. The meeting commenced at 7:30 p.m. and concluded at approximately 10 p.m. This meeting occurred well prior to the May 3, 1983, escrow closing on the property purchased by the Hudsons. Portions of the meeting were tape-recorded and have been transcribed. At oral argument, Vaill's counsel conceded that no evidence was presented which indicates that the transcription is inaccurate in any respect.

At the April 12, 1983, meeting, the county officials estimated that the costs associated with securing expert geological opinions, revitalizing existing drains, installing new drainage systems, drilling observation wells, and

taking other measures ranged from $25,000 in start-up costs to upwards of $2 million over the longer term. Head Engineer Art Keene was asked about the $2 million figure and he said, "I'd like to explain that two million dollars because those are valid numbers." Both Art Keene and Edwin Biddlecomb indicated that the county was not responsible for the problem. Furthermore, Armando Cid, the division engineer for the regional offices division of the county engineer, stated that county counsel had concluded that the county was not legally liable for the problem. During the meeting, Vaill raised a question concerning the consequences of spending "all this kind of money" and the problems remaining after the money was expended.

In order to resolve the problem, the various county officials recommended that a special assessment district be created with taxing authority. After a discussion concerning the ongoing problem caused by the high-water table, Edwin Biddlecomb stated: "Okay, before we get any further I'd like to call on Armando Cid, whose gonna discuss these [sic] formation of these districts that might be a method of alleviating the problem. It may be a method of starting up these pumps and having assessment area formed to pay for that, rather than having it on a voluntary contribution basis. It didn't work before." Armando Cid discussed the fact that because the county did not want to undergo potential future liability for further damage in the area, it was the opinion of various county agencies that a special assessment district be formed. He referred to the district as a "Geologic Hazard Abatement District." He stated, "Essentially, the bottom line is that if the people here wanted to form a district and it involved the whole procedure and it went through, it would form a district with your own board of directors of five people. In essence you would wind up with a small little city. You have taxing rights. You could tax eminent domain, you could use the Improvement District Acts of 11 and 13 to pay for this thing and spread over 10 years. You could do anything. . . . [T]he bottom line of this whole thing is that it would wind up as part of the tax bill. So if someone did not pay the tax bill, then eventually when 4 years go by, they would lose the property, whatever . . . ." Later, Armando Cid continued: "Usually the way this thing works is that it would take, to get it started, it would take 10% of the property owners, well property owners that owned at least 10% of the assessed evaluation [sic] of the area that you're talking about, owners that owned 10% of the said value, whatever. . . . It would require an initial investment on your part, because of part of this submittal to us is 10%, is what is called a plan of control, and this is where you would have to get a report prepared by an engineering geologist." He then proceeded to discuss the procedural aspects of setting up a special assessment district.

Art Keene continued the discussion by noting the importance of installing observation wells which he termed as "[v]ery cheap to put in" but he was

interrupted by Mike Johnson, the flood control district geologist who said, "Nothing's cheap anymore." Armando Cid discussed the fact that it was difficult to determine how much the assessment would be. Art Keene indicated that the total costs could be $2 million. Mike Johnson, the geologist with the flood control district also discussed the costs of various wells.

At the conclusion of the meeting, two documents were prepared for signature by the residents. One document was entitled, "We, the following are in favor of county service area-Big Rock Mesa." The other document said, "We, the following are in favor of landslide abatement district-Big Rock Mesa for those who are in favor of the landslide abatement district approach to the solution of the problem." Vaill signed both documents.

The foregoing evidence is uncontradicted. Unlike the typical case where persons who attend a meeting offer different versions of what transpired, the issue in the case at bar is presented to this court based upon uncontradicted verifiable evidence of what was actually said. I therefore conclude that Vaill's failure to apprise the Hudsons of what occurred in connection with future costs and the county recommendations of the establishment of a special assessment district at the April 12, 1983, meeting and her reaction to the events at the meeting constituted negligence.[1] As a real estate agent representing the seller, Vaill had a duty to disclose facts which materially affected the value or desirability of the property offered for sale of which she was aware. (*Cooper* v. *Jevne* (1976) 56 Cal.App.3d 860, 866 [128 Cal.Rptr. 724].) Neither the Merrill nor the Byers report apprised the Hudsons of the April 12, 1983, meeting.

There were several matters supported by uncontradicted evidence raised at the meeting which, when considered together, should have been brought to the Hudsons' attention. First, they should have been informed that the county was disavowing any liability for the rising groundwater levels in the area. Second, the Hudsons should have been told that the county was recommending that a special assessment district with taxing and eminent domain powers be instituted. Third, they should have been notified of the potential costs of the special assessment district. These three factors taken together were matters which would materially affect the value of the property Vaill was attempting to sell to the Hudsons. Finally, Vaill's lack of concern as to what transpired at the meeting is further evidence of negligence. The issues raised by official representatives of the county at the meeting were important. For Vaill not to recognize this, given her special responsibility as a real estate

---

[1] I am unable to determine whether, as a matter of law, the failure to disclose the events of the meeting constituted "incompetence." Therefore, I would affirm the judgment in that respect.

salesperson, constituted negligence. This was a specific ground for revocation appearing in the first amended accusation. Because this is an extremely rare case where negligence is demonstrated as a matter of law, I would therefore affirm the trial court's finding in all respects except as to Vaill's negligent failure to apprise the Hudsons of what occurred at the April 12, 1983, meeting. I would therefore remand the case to superior court with directions to issue a writ of mandate directing the Director of the Department of Real Estate to impose a penalty, if any, commensurate with the gravity of the findings supported by the evidence. (*Bonham* v. *McConnell* (1955) 45 Cal.2d 304, 306 [288 P.2d 502].)