[No. C045644. Third Dist. Oct. 29, 2004.]

HANDYMAN CONNECTION OF SACRAMENTO, INC., Plaintiff and Appellant, v.
STEVEN P. SANDS, as Registrar of Contractors, etc., et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II of the DISCUSSION.

## COUNSEL

Abdulaziz & Grossbart, Bruce D. Rudman and Sam K. Abdulaziz for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Arthur D. Taggart, Diana Woodward Hagle and Patrick M. Kenady, Deputy Attorneys General, for Defendants and Respondents.

## OPINION

**SIMS, Acting P. J.**—In this case, we construe various provisions of the Contractors' State License Law related to a contractor's solicitation and obtaining of a contract to perform work in someone's home.

In a disciplinary proceeding against plaintiff Handyman Connection of Sacramento, Inc. (Handyman) brought by the Contractors' State License Board (the Board), an administrative law judge (ALJ) found that Handyman had committed four violations of the Contractors' State License Law. (Bus. & Prof. Code, § 7000 et seq. (the License Law).)[1] The Board adopted the ALJ's proposed decision and imposed a penalty of $350.

Handyman filed a petition for peremptory writ of administrative mandamus against defendant Steven P. Sands, Registrar of Contractors, in Sacramento County Superior Court, seeking to vacate the Board's decision. The trial court denied the petition. Handyman appeals from the ensuing judgment. We shall reverse one of four grounds of discipline found by the Board and otherwise affirm the judgment.

---

[1] Undesignated statutory references are to the Business and Professions Code.

## FACTUAL AND PROCEDURAL BACKGROUND

### The citation

On January 26, 2001, the Registrar of Contractors[2] issued a citation to Handyman in regard to its project installing hardwood flooring at the home of Forrest and Jo-Ann Myhres. The citation alleged the following License Law violations:

Item No. 1 (assessed penalty, $100): Failed to provide a contract and "Notice of Cancellation" that complies with Civil Code section 1589.7 [(*sic*; 1689.7)]. (§ 7110.)[3]

Item No. 2 (assessed penalty, $50): Used improper business name (Handyman Connection, rather than Handyman Connection of Sacramento, Inc., the name in which the license is issued). (§ 7117, subd. (a).)[4]

Item No. 3 (assessed penalty, $100): Employed unregistered home improvement salesperson. (§ 7154.)[5]

Item No. 4 (assessed penalty, $100): Failed to comply with the following provisions of the law regarding home improvement contracts (§ 7159, subds. (a)–(c), (f), (g), (j), (k), (*l*)):

(a) Failed to include the name, address, and license number of the contractor, and/or the name and registration number of the home improvement salesperson in the contract.

(b) Failed to include the approximate starting and completion dates in the contract.

---

[2] The registrar is appointed by the Board to be the Board's executive officer and secretary. (§ 7011.)

[3] Section 7110 provides in part: "Willful or deliberate disregard and violation of the building laws of the state . . . constitutes a cause for disciplinary action."

Civil Code section 1689.7 provides in part that any "home solicitation contract" as defined in Civil Code section 1689.5 shall contain a cancellation form in a specified location and type style, in duplicate and easily detachable from the contract, which informs the buyer that he or she may cancel the transaction without penalty or obligation within three business days of signing the contract, and which sets out the seller's name and business address. (Civ. Code, § 1689.7, subds. (a)(1), (b), (c), (f)–(h).)

[4] Section 7117 provides: "Acting in the capacity of a contractor under any license issued hereunder except: (a) in the name of the licensee as set forth upon the license, . . . constitutes a cause for disciplinary action."

[5] Section 7154 provides: "A home improvement contractor who employs a person to sell home improvement contracts while such person is not registered by the registrar as a home improvement salesman as provided in this article, is subject to disciplinary action by the registrar."

(c) Failed to include a description of the work to be done, the materials and equipment to be used, and the agreed consideration for the work in the contract.

(f) Failed to include a statement re unconditional claim/lien releases to be provided for any portion of work for which payment has been made.

(g) Failed to include a notice in at least 10-point type, near the signature of contractor and owner, stating owner or tenant has the right to require a performance and payment bond.

(j) Failed to include a notice as to the California mechanics' lien law, as required by section 7018.5.

(k) Failed to include a statement of what constitutes substantial commencement of work.

(*l*) Failed to include a notice that failure to substantially commence work within 20 days is a violation of the law.

### The administrative hearing

Handyman contested the citation. An ALJ heard the matter. Both sides submitted briefs and presented witnesses.

Handyman's hearing brief disputed all the alleged violations.

As to Item No. 1, Handyman maintained Jo-Ann Myhres had waived cancellation rights in writing so as to authorize work to start immediately. (Civ. Code, § 1689.13.)[6]

As to Item No. 2, Handyman maintained that the contract showed Handyman's full licensed business name, along with the shorter form "Handyman Connection."[7]

---

[6] Civil Code section 1689.13 provides in part: "Sections 1689.5 to 1689.7, inclusive, . . . shall not apply to a contract that is initiated by the buyer . . . and that is executed in connection with the making of emergency or immediate necessity repairs or services that are necessary for the immediate protection of persons or real or personal property, provided that the buyer furnishes the seller with a separate dated and signed personal statement describing the situation requiring immediate remedy and expressly acknowledging and waiving the right to cancel the sale within three . . . business days."

[7] Handyman disagreed with the Board about which document or documents constituted the contract. The Board asserted that the contract was a document styled "Labor Estimate" signed by Forrest Myhres a month before work started. Handyman asserted that a document styled

As to Item No. 3, Handyman maintained that Gary Bon, the alleged unregistered home improvement salesperson, came within two statutory exceptions to the registration requirement: (1) the exception for "[a] bona fide service repairperson who is in the employ of a licensed contractor and whose repair or service call is limited to the service, repair, or emergency repair initially requested by the buyer of the service" (§ 7152, subd. (b)(5)); and (2) the purported exception for a person qualifying for a contractor's license in his own right (§ 7152, subd. (b)(2)).[8]

As to Item No. 4, Handyman maintained that its contract with the Myhreses, which consisted of the "Agreement" signed on the starting date and the earlier "Labor Estimate" read together, contained all the notices required by law.

Handyman also asserted that the Board had violated Handyman's constitutional rights to earn a livelihood and to receive equal protection of the laws. The record of discipline would "place a scarlet letter on H[andyman]'s license so that anyone reviewing the web site would not dare use its services." Furthermore, contractors normally get only warning letters for "ticky-tack," "form[]," "technical" violations such as those alleged here.

In a posthearing brief, Handyman asserted that the Board's interpretations of section 7152, subdivision (b)(2) and (5), altered or amended the plain terms of the statutes in excess of the Board's authority, thus unconstitutionally violating substantive due process.

*The decision*

After the hearing, the ALJ filed a proposed decision upholding the citation, which the Board adopted without change.

*Factual findings*

1. The Registrar of Contractors issued the citation at issue to Handyman on January 26, 2001, charging violations of sections 7110, 7117, subdivision (a), 7154, and 7159.

2. At all relevant times, Handyman was a licensed general contractor.

---

"Agreement" signed by Jo-Ann Myhres on the starting date was the contract, or that the two documents read together were.

[8] This provision states that "[a] qualifying person, as defined in Section 7068" shall not be required to register as a home improvement salesperson. (§ 7152, subd. (b)(2).) We discuss section 7068 below.

3. On March 20, 1999, Handyman entered into a home improvement contract with the Myhreses, under which Handyman was to provide labor for the installation of hardwood flooring in the master bedroom and a hallway, at a total price of "no more than" $2,810, and "as low as" $2,590.[9] On April 19, 1999, Handyman purported to enter into a contract with the Myhreses for the same job on the same terms.[10]

4. In early 1998, the Myhreses decided they wanted to replace wall-to-wall carpeting in their master bedroom and a hallway with hardwood flooring. They bought the flooring, intending to install it themselves, but did not. After receiving an advertisement from Handyman in the mail, they called Handyman about the project. It was arranged that Gary Bon, a licensed, individual, independent contractor, would come to the Myhres home to discuss the project. He did so on March 20, 1999, then contacted Handyman and arrived at the price range shown on the contract.

The contract, titled "Labor Estimate," initially served as such.[11] It indicated it had been prepared by Bon on March 20, 1999, described the work to be done as "install hardwood flooring master bed room and hallway," and gave the prices indicated above plus "labor cost $2590.00," a sum initialed by Bon and Forrest Myhres.

However, the document also had a section titled "Acceptance of Proposal," which said: "The specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payment will be made upon completion." Bon and Forrest Myhres signed immediately below these words.

Viewing the "Labor Estimate" in its entirety, a reasonable person would conclude, as the Myhreses did, that it became a binding contract once executed. Consistent with this conclusion, the document also contains the words "Make checks payable to Handyman Connection," a "Guarantee" on the back, and a "Notice Required by [] section 7030" which begins: "State law requires anyone who contracts to do construction work to be licensed . . . if the total price of the job is $300 or more (including labor and materials)."

---

[9] This contract, the document headed "Labor Estimate," is subsequently referred to throughout the decision as "Contract No. 1." We will call it "the contract" or "the real contract."

[10] This document, denominated "Agreement," is subsequently referred to throughout the decision as "Contract No. 2." We will call it "the purported contract."

[11] This "Labor Estimate," of March 20, 1999, which the Board found to be a "contract," is attached, *post*, as appendix A.

5. On April 19, 1999, Bon returned to the Myhres home to begin work. At that time he had Jo-Ann Myhres sign the purported contract (the Agreement), which had substantially more standard terms and notices and bore the words "Contract No. 4820."[12]

6. The real contract (the Labor Estimate) did not comply with the provisions of Civil Code section 1689.7, as charged in Item No. 1 of the citation. As a home improvement construction contract, it was required by statute to give the buyers notice of their right to cancel within three business days, but it did not. (The purported contract entered into on April 19 did contain this notice and related matters among its "standard terms." However, its explanation of the buyer's right did not conform to Civil Code section 1689.7.)

7. The contract did not use Handyman's licensed business name, as charged in Item No. 2 of the citation. It used only the appellation "Handyman Connection," not "Handyman Connection of Sacramento, Inc." (The purported contract of April 19 indicates that Handyman Connection is a "dba" of "Handyman Connection of Sacramento," it also did not contain the name set forth on Handyman's license; however, the correct licensed name is printed below the line for Handyman's signature.)

8. Handyman employed an unregistered home improvement salesperson, as charged in Item No. 3 of the citation. Gary Bon, who was not registered, acted as a home improvement salesperson for Handyman: he sold home improvement goods and services, was an agent for Handyman, and negotiated the contract.

9. The contract failed to comply with the statutory requirements enumerated in Item No. 4 of the citation. The later purported contract could not remedy the deficiencies of the real contract because it was produced 30 days after that contract.

10. The civil penalties assessed in the citation, totaling $350, are fair and reasonable. All are in the category of minimum penalties.

*Legal conclusions*

1. Factual finding 6 (failure to provide required notice of right to cancel) constitutes cause to deny Handyman's appeal of Item No. 1 in the citation. Handyman argued that the purported contract dated April 19, 1999, was a contract executed in connection with the making of "emergency or immediate

---

[12] This "Agreement," of April 19, 1999, is attached, *post*, as appendix B.

necessity repairs or services that are necessary for the immediate protection of persons or real or personal property" (Civ. Code, § 1689.13), to which this requirement for notice does not apply. This argument fails because finding 6 does not involve the purported contract. But even if it did, there was no emergency or immediate necessity as of April 19, 1999. Therefore, Handyman's contention that the Myhreses waived cancellation rights in writing is irrelevant. It is also irrelevant and unnecessary to find whether a writing signed by Jo-Ann Myhres constitutes a valid waiver statement under Civil Code section 1689.13; however, under that provision a waiver is required only in connection with emergency repairs or services.

2. Factual finding 7 (use of wrong namestyle) constitutes cause to deny Handyman's appeal as to Item No. 2 of the citation. As this finding concerns only the real contract, it is unnecessary to decide whether the purported contract also is in violation.

3. Factual finding 8 (use of unregistered home improvement salesperson) constitutes cause to deny Handyman's appeal as to Item No. 3 of the citation. Handyman admits that Gary Bon was a home improvement salesperson, and the statutory exemptions from the registration requirement on which it relies do not apply to him.

The exemption for "[a] qualifying person, as defined in Section 7068" (§ 7152, subd. (b)(2)) does not apply. The ALJ found that in the context of the License Law, this expression "means a natural person whose knowledge and experience provide the basis for licensing *another natural person or another organizational entity*. It does not mean a natural person who provided the experience and knowledge necessary for [qualifying] *his own license*." (Italics added.) Though a licensed contractor, Bon was not the "qualifying person" for Handyman's license. Therefore his license did not exempt him from the requirement to register as a salesperson when working as such for Handyman.

The other exemption claimed by Handyman, for a "bona fide service repairperson who is in the employ of a licensed contractor and whose repair or service call is limited to the service, repair, or emergency repair initially requested by the buyer of the service" (§ 7152, subd. (b)(5)), also does not apply. Bon performed an installation service, not a repair service.

4. Factual finding 9 (failure to comply with enumerated provisions of § 7159) constitutes cause to deny Handyman's appeal as to Item No. 4 of the citation.

5. Factual finding 10 justifies the civil penalties assessed.

6. Handyman's constitutional arguments regarding the interpretation of section 7152 would be deferred to the consideration of an appellate court.

*The writ petition*

Handyman filed a verified petition for peremptory writ of administrative mandamus in the superior court. Its supporting points and authorities asserted that the trial court was required to apply the independent-judgment standard of review because the Board's decision involved Handyman's fundamental vested rights. The Attorney General's response disputed both points.

*The trial court's statement of decision*

The trial court issued the following statement of decision upholding the Board's order:

"Petitioner is challenging a citation imposed against it for certain violations of the Business and Professions Code.

"The first question is whether or not Exhibit 4 of the administrative record, referred to [by the ALJ] as Contract 1, the document titled Labor Estimate dated March 20, 1999, is a contract requiring compliance with the Contractors' Law. I find that this document is a contract. Whether or not the second document, referred to [by the ALJ] as Contract 2, Exhibit 5 of the administrative record, is also a contract is irrelevant to this determination.

"Both documents were negotiated by Gary Bon on behalf of Petitioner. Gary Bon is not a registered home improvement salesperson. Thus, the next question is whether Mr. Bon comes within any of the exceptions set forth in . . . section 7152, subd. (b).

"[S]ection 7152, subd. (b)(2) provides an exception for 'A qualifying person, as defined in Section 7068.' The language of this provision in Section 7152 does not specifically state that this exception is for a qualifying person for the particular home improvement contract or involved in the transaction. But this is the only logical reading of this provision. *Petitioner argues that Mr. Bon is licensed as a glazier, and thus, that is sufficient for this exception to apply.*[13] I disagree. It is not reasonable to interpret this provision to exempt anyone who has any kind of a license from the requirements of registering as a home improvement salesperson. The intent of this law is to protect the public with regard to home improvement salespersons. The

---

[13] Handyman has not seen fit to mention in any written submission at any stage of this case—including its briefs filed in this court—that Bon is licensed only as a glazier.

[L]egislature wanted there to be an adequate identification of the salesperson on the contract, namely a registration number. A license for something else does not provide the same kind of protection. While Mr. Bon may or may not be a fine person, his being licensed as a glazier does not identify him in any way as a home improvement salesperson. The qualifying person referred to in . . . section 7068 refers to the person who qualifies the particular home improvement contractor involved in the transaction, namely the responsible managing officer or responsible managing employee of Handyman Connection of Sacramento, Inc., who qualified the corporation for its contractor's license.

"Petitioner next argues that Bon is covered by the exception provided in . . . section 7152, subd. (b)(5). This argument is also not persuasive. Bon was not acting as a bona fide service repairperson. The salient distinction is not so much what is a service versus what is a repair. The distinction is home improvement salesperson versus a service repairperson. Here Bon responded to a call for a home improvement, i.e., installing a wood floor. Therefore, he is not exempted from registration.

"Having already found that Contract 1 is a contract for purposes of complying with the Business and Professions Code, the Court finds that there is substantial evidence to support the findings of all the other violations included in Respondent's decision. The decision is also supported by the findings.

"Petitioner also argues that the independent judgment test should apply here. Again, I disagree. But, even applying that test, I also find that the findings are supported by the weight of the evidence." (Italics added.)

The trial court thereafter entered judgment in favor of the Board, from which Handyman appeals. The judgment, like the statement of decision, cites both the "substantial evidence" test and the "independent judgment" test.

## DISCUSSION

### I

*Standard of review*

As it did below, Handyman contends that the Board's findings must be reviewed under the independent-judgment standard because the Board's order infringes a fundamental vested right—Handyman's right to engage in the

occupation for which it is licensed. The Attorney General replies, as below, that only substantial-evidence review is required. Neither party is entirely correct.

■ In an administrative mandamus case where a fundamental vested right is at stake, the *trial court* must exercise independent judgment and determine whether a preponderance of the evidence supports the administrative findings of fact. (Code Civ. Proc., § 1094.5, subd. (c); *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 811–812 [85 Cal.Rptr.2d 696, 977 P.2d 693]; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 144–146 [93 Cal.Rptr. 234, 481 P.2d 242]; *Angelier v. State Board of Pharmacy* (1997) 58 Cal.App.4th 592, 595–596, fn. 3 [68 Cal.Rptr.2d 213]; *Vaill v. Edmonds* (1991) 4 Cal.App.4th 247, 257–258 [6 Cal.Rptr.2d 1].) Where a fundamental vested right is not at stake, the trial court need only determine whether substantial evidence supports those findings. (Code Civ. Proc., § 1094.5, subd. (c); *Steinsmith v. Medical Board* (2000) 85 Cal.App.4th 458, 464–465 [102 Cal.Rptr.2d 115].) And on appeal, whichever standard was used below, the standard of review of the trial court's factual determination is whether the trial court's findings are supported by substantial evidence. (*Fukuda v. City of Angels, supra,* 20 Cal.4th at p. 824; *Yakov v. Board of Medical Examiners* (1968) 68 Cal.2d 67, 71–72 [64 Cal.Rptr. 785, 435 P.2d 553]; *Drummey v. State Bd. of Funeral Directors* (1939) 13 Cal.2d 75, 86 [87 P.2d 848]; *Angelier v. State Board of Pharmacy, supra,* 58 Cal.App.4th at p. 596, fn. 3.)

■ In a case such as this one, where the only sanction imposed is a fine—not revocation, suspension, or restriction of the petitioner's license—no fundamental vested right is implicated and the trial court is not authorized to exercise independent judgment on the evidence. (*Steinsmith v. Medical Board, supra,* 85 Cal.App.4th 458, 464–465.)[14]

Arguing the contrary, Handyman asserts that the public nature of its disciplinary record means "for five years, HANDYMAN will have a scarlet letter on its forehead."[15] This assertion is not persuasive. The citation here does not prevent Handyman from carrying on its trade or restrict it in any way. Handyman may find business harder to come by with a public disciplinary record, as it speculates, but that is immaterial. As explained below, the

---

[14] In its reply brief Handyman cites *Coldwell Banker & Co. v. Department of Insurance* (1980) 102 Cal.App.3d 381 [162 Cal.Rptr. 487] for the proposition that if administrative discipline will cause any "economic detriment" to a licensee, independent judgment is required on review. As Handyman fails to provide a pinpoint cite to show where the decision so states, we do not consider the point.

[15] Any citation imposed by the Board remains a matter of public record for five years. (§ 7124.6.)

purpose of the License Law is to protect the public. The right to do business as a contractor cannot entail a right to hide one's infractions.

Because these proceedings did not implicate any fundamental vested right, the trial court was required to determine only whether substantial evidence supported the Board's findings of fact. (So far as the court applied the independent-judgment test to fact questions, it should not have done so; but as it reached the same result under both tests, any error was harmless.) On review, we likewise determine only whether substantial evidence supports the trial court's findings of fact.

As to questions of law, however, we must exercise our independent judgment. (*Silver v. Los Angeles County Metropolitan Transportation Authority* (2000) 79 Cal.App.4th 338, 348 [94 Cal.Rptr.2d 287]; *Home Depot, U.S.A., Inc. v. Contractors' State License Bd.* (1996) 41 Cal.App.4th 1592, 1599 [49 Cal.Rptr.2d 302], superseded by statute on another point, as stated in *Denver D. Darling, Inc. v. Controlled Environments Construction, Inc.* (2001) 89 Cal.App.4th 1221, 1231, fn. 4 [108 Cal.Rptr.2d 213].) Some issues here turn on interpreting the License Law. In applying independent judgment on this subject, we must give deference to the Board's interpretations, but not to the exclusion of other tools of statutory construction. "[T]he binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

## II*

### Objection to the statement of decision

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III

### Statutory construction

Before turning to Handyman's remaining contentions, we note a few basic rules of statutory construction and their relevance to the License Law.

" ' "We begin with the fundamental rule that our primary task in construing a statue is to determine the Legislature's intent. [Citation.]" [Citation.] " 'The court turns first to the words themselves for the answer.' [Citations.]" [Citation.] When the statutory language is clear and unambiguous, there is no

---

*See footnote, *ante*, page 867.

need for construction and courts should not indulge in it. [Citation.] The plain language of the statute establishes what was intended by the Legislature. [Citation.]' [Citation.]" (*People v. Statum* (2002) 28 Cal.4th 682, 689–690 [122 Cal.Rptr.2d 572, 50 P.3d 355].)

In focusing on the words of a statute, we give them their ordinary meaning. (*California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 338 [33 Cal.Rptr.2d 109, 878 P.2d 1321].) "Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.]" (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].) If there is any ambiguity, we resolve it by "examining the context in which the language appears and adopting the construction which best serves to harmonize the statute internally and with related statutes." (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 871 [39 Cal.Rptr.2d 824, 891 P.2d 804].) The legislative history of a statute may be useful in this examination. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) So may the interpretation of a statute by the agency charged with implementing it. (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th 1, 7.)

The intent of the License Law is clear. "The courts of this state have long emphasized that the Law 'was enacted for the safety and protection of the public against imposition by persons inexperienced in contracting work, and for the prevention of fraudulent acts by contractors resulting in loss to subcontractors, materialmen, employees, and owners of structures.' [Citation.]" (*Home Depot, U.S.A., Inc. v. Contractors' State License Bd., supra,* 41 Cal.App.4th 1592, 1605.) Thus, if any ambiguity appears in the language of the License Law, we must construe the law so as to effectuate the Legislature's intent to protect the public.

## IV

### *The alleged violations*

Handyman contends that all four charges in the citation were wrongly sustained. We agree as to Item No. 2 (wrong namestyle), but disagree as to the rest.

 A. *Item No. 1 (failure to provide notice of right to cancel within three business days)*

"In a home solicitation contract . . . the buyer's agreement . . . shall contain in immediate proximity to the space reserved for his or her signature a

conspicuous statement in a size equal to at least 10-point bold type, as follows: 'You, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction. See the attached notice of cancellation form for an explanation of this right.' " (Civ. Code, § 1689.7, subd. (a)(1).) Subdivision (b) of Civil Code section 1689.7 requires the agreement to contain on the first page, in a type size no smaller than that used in the body of the document, the seller's name and address and the date the buyer signed the agreement. Subdivision (c) of Civil Code section 1689.7 sets out the required format for the notice.

A "home solicitation contract" as used in Civil Code section 1689.7 means "any contract, whether single or multiple, . . . for the sale, lease, or rental of goods or services or both, made at other than appropriate trade premises in an amount of twenty-five dollars ($25) or more, including any interest or service charges." (Civ. Code, § 1689.5, subd. (a).) "Goods" means "tangible chattels bought for use primarily for personal, family, or household purposes, . . . and including goods that, at the time of the sale or subsequently, are to be so affixed to real property as to become a part of the real property whether or not severable therefrom . . . ." (Civ. Code, § 1689.5, subd. (c).) "Services" means "work, labor, and services, including, but not limited to, services furnished in connection with the repair, restoration, alteration, or improvement of residential premises . . . ." (Civ. Code, § 1689.5, subd. (d).)

Handyman does not dispute the document that the ALJ and the trial court found to be the contract—the "Labor Estimate" dated March 20, 1999 (appen. A, *post*)—does not contain the required notice. Handyman asserts, rather, that that document is not the contract in the Myhres transaction, and that the real contract—the "Agreement" dated April 19, 1999—complies with the statute.[16] Handyman is wrong on both points.

■ The "Labor Estimate" is the binding contract in this case because it contains all the elements of a home solicitation contract and both parties performed in accordance with it; therefore, it was required to inform the Myhreses of their cancellation rights. But even if the subsequent "Agreement" may be considered, it too fails to comply with Civil Code section 1689.7 because Jo-Ann Myhres's purported waiver of notice is ineffectual.

*The "Labor Estimate" (appen. A, post)*

"It is essential to the existence of a contract that there should be: [¶] 1. Parties capable of contracting; [¶] 2. Their consent; [¶] 3. A lawful object; and [¶] 4. A sufficient cause or consideration." (Civ. Code, § 1550.) The

---

[16] So far as Handyman contends in the alternative that the two documents read together form the contract, we disagree for the reasons stated below in part IV.D. of the Discussion.

"Labor Estimate" has all of these elements. It names the parties. Under "Description" it sets out the object of the contract and its consideration: "Install hardwood flooring master bed room and hallway, 277 [square feet] [¶] Labor cost $2590.00 [followed by the initials "G.B." and "F.M."]."[17] Finally, under "Acceptance of Proposal" it sets out the parties' consent: "The specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payment will be made upon completion." Below these words are the signatures of Gary Bon ("prepared by") and Forrest Myhres ("approved by"). Nothing more was needed to create a binding contract, as the parties recognized: Jo-Ann Myhres considered the Myhreses contractually bound once they had signed the "Labor Estimate," and Bon returned to start work on Handyman's behalf without further negotiation.[18]

Though the later "Agreement" adds matters omitted from the "Labor Estimate," it does not change any term specified there. Thus, when the "Agreement" was executed, the parties had already entered into a home solicitation contract within the meaning of Civil Code section 1689.5 which did not contain the notice of cancellation rights required by Civil Code section 1689.7.

The trial court correctly found that substantial evidence supported Item No. 1 of the citation.

*The "Agreement"*

Handyman asserts that the "Agreement" of April 19, 1999, does not violate Civil Code section 1689.7 because when Jo-Ann Myhres signed it she also wrote and signed a "personal statement" that authorized work to start immediately and expressly waived the Myhreses' right to cancel, pursuant to Civil Code section 1689.13. This agreement does not aid Handyman for two reasons. First, Handyman violated section 1689.7 by entering into the contract of March 20, 1999, and this is so regardless of what is said a month later. Second, while it is true that under the circumstances described in section 1689.13 a buyer may legally waive the right of cancellation, those circumstances did not exist here. Thus, even if the "Agreement" could properly be deemed part of the contract, Handyman's conduct would still not be exonerated.

---

[17] "Labor cost" is broken down elsewhere into two sets of figures, "no more than" $2,810 and "as low as" $2,590. However, the latter number is circled, in keeping with the inclusion of that figure under "description" and its initialing by the parties. The Myhreses paid that exact amount on April 20, 1999.

[18] Bon, testifying for Handyman at the hearing, admitted that the "Labor Estimate" "sounds like a contract." Handyman's CEO, Richard McGreevy, who is also an attorney, admitted that it has "indicia of a contract."

"Sections 1689.5 to 1689.7, inclusive, . . . shall not apply to a contract that is initiated by the buyer . . . and *that is executed in connection with the making of emergency or immediate necessity repairs or services that are necessary for the immediate protection of persons or real or personal property*, provided that the buyer furnishes the seller with a separate dated and signed personal statement *describing the situation requiring immediate remedy* and expressly acknowledging and waiving the right to cancel the sale within three . . . business days . . . ." (Civ. Code, § 1689.13; italics added.)

A pre-printed attachment to the "Agreement," titled "AUTHORIZATION TO START WORK," reads as follows: "One of the following statements *MUST BE HANDWRITTEN BY THE CUSTOMER* to allow the Handyman Connection craftsman to begin work immediately: [¶] 1. Due to the emergency nature of the work, I hereby waive the three-day recission [*sic*] period. [¶] *OR* [¶] 2. It is my personal desire to start this work immediately and I waive the three-day recission [*sic*] period." Immediately afterward appears the following statement, handwritten, signed, and dated by Jo-Ann Myhres: "It is my personal desire to start this work immediately and I waive the three-day recission [*sic*] period."

Jo-Ann Myhres's statement does not satisfy Civil Code section 1689.13 because it does not "describ[e] the situation requiring immediate remedy" and because, in fact, no emergency existed.

Jo-Ann Myhres testified that Bon gave her this form on April 19, 1999, and asked her to write out the second statement exactly as it appeared on the form. The words she wrote were not her words.

Bon testified that Handyman routinely provides him this form when he goes out on jobs. If a customer wants work to start immediately, Bon is supposed to use the form before he starts the job. Asked if it was "just a matter of, quote, personal desire?", he answered: "Yes."

Handyman's chief executive officer (CEO), McGreevy testified that he approved the form. He admitted that Civil Code section 1689.13 does not contain the term "personal desire," but explained: "[I]t was our belief that it can only be the consumer that would make the decision whether or not it was an immediate necessity, and so the personal desire to start the work immediately was just our way of having the consumer make that statement that it was their personal desire to start the job immediately and that would meet the immediate necessity language."

Handyman repeats this argument on appeal, asserting that Civil Code section 1689.13 creates a subjective standard which depends only on the

homeowner's desires. To put it bluntly, this is nonsense. Civil Code section 1689.13 does not state that "personal desire" to start work immediately is sufficient to create an "emergency or immediate necessity."[19] Nor does Handyman cite any authority so construing the statute.

Handyman asks us to rewrite section 1689.13 by inserting new language to make the statute serve a purpose at odds with the Legislature's express purpose. We may not do so. (*Burden v. Snowden, supra,* 2 Cal.4th 556, 562.)

As a fallback position, Handyman asserts that there was an "emergency or immediate necessity" because the Myhreses removed carpeting and exposed the particle board underlayment to prepare for the installation job. According to Handyman, "[i]t was uncontroverted that the particle board underlayment was not intended as a walking surface and using it as a walking surface would cause damage to the particle board." This assertion was not uncontroverted. Even if it had been, it was made by a witness without any expertise to opine on the subject. And even if uncontroverted and given by an expert, it would not establish "emergency or immediate necessity" within the meaning of Civil Code section 1689.13.

Handyman cites only to the testimony of its CEO, McGreevy. However, McGreevy is not individually licensed as a contractor, and his testimony does not reveal any relevant expertise; thus his self-serving lay opinion deserves little weight. Furthermore, Jo-Ann Myhres testified that there was no problem walking on the floor during the short time between the removal of the carpeting and the start of work. But most important, even if walking on the particle board *indefinitely* might have damaged or destroyed it *in the long term*, this would not establish an "emergency" or an "immediate necessity" to remedy the problem. Construing these statutory terms in their ordinary sense (*California School Employees Assn. v. Governing Board, supra,* 8 Cal.4th 333, 338), they do not include long-term or ultimate problems.

Therefore, even if the "Agreement" and Jo-Ann Myhres's "personal statement" could be considered as part of the contract, they would not show that Handyman complied with the law.

### B. *Item No. 2 (working out of namestyle)*

"Acting in the capacity of a contractor under any license issued hereunder except: (a) in the name of the licensee as set forth upon the license, . . . constitutes a cause for disciplinary action." (§ 7117.)

---

[19] In any event, handing a homeowner a preprinted form and telling her she must copy part of it verbatim is hardly the best way to ascertain her "personal desire."

Furthermore, as we have said, to justify the waiver of rights a homeowner's personal statement must "describ[e] the situation requiring immediate remedy." (Civ. Code, § 1689.13.) The sentence Jo-Ann Myhres was told to copy does not do so.

Handyman claims it complied with this provision because the "Agreement" gives Handyman's full name as set forth on its license ("Handyman Connection of Sacramento, Inc."). The trial court disagreed, finding that only the real contract (the "Labor Estimate"), which shows the firm's name only as "Handyman Connection," could be considered on this issue.

We conclude the trial court erred, but not for the reason Handyman gives. Rather, the information set out in the real contract, when considered in full, substantially complied with the statute.

Section 7117 has not received much judicial construction. The case closest on point is *Asdourian v. Araj* (1985) 38 Cal.3d 276 [211 Cal.Rptr. 703, 696 P.2d 95] (*Asdourian*). *Asdourian* mainly addresses section 7031, which requires a person seeking compensation for contracting work to prove he was a duly licensed contractor at all times during his performance; however, *Asdourian* also cites section 7117, and its rationale applies to that provision as well.

As to section 7031, *Asdourian, supra,* 38 Cal.3d 276, held that substantial compliance is sufficient. Therefore, the plaintiff, Krikor Asdourian, could obtain compensation for his work even though he used his own name in the transactions at issue rather than the business name on his contractor's license (Artko), which was entirely different from his own name.[20] (*Id.* at pp. 282–289.) The policy behind section 7031—the enforcement of the License Law (*Asdourian,* at p. 282)—was satisfied because at the time of the contracts the plaintiff's firm held a valid license, which bore his name as the responsible managing party; the license, which officially attested to his experience and qualifications, was effective throughout his performance; and his competence and experience formed the basis of his firm's license. If the license had been issued to the plaintiff in his own name, the situation would not have differed materially from the actual situation. (*Id.* at pp. 285–286.) Thus, the discrepancy between the name the plaintiff used on the contracts and the name on his firm's license was a "technicality" that could not defeat his right to compensation. (*Id.* at p. 289.)[21]

■ Here, although the "Labor Estimate" bears only the name "Handyman Connection," and not "Handyman Connection of Sacramento, Inc.," it contains all the information about the name of the contractor needed to comply

[20] In this connection, the court noted that the plaintiff's conduct also violated section 7117, construed literally. (*Asdourian, supra,* 38 Cal.3d 276, 285.)

[21] After *Asdourian, supra,* 38 Cal.3d 276, was issued, the Legislature amended section 7031 to bar a substantial-compliance defense to the statute. Subsequently, however, that provision was amended further to permit substantial compliance as a defense under certain circumstances. (§ 7031, subd. (d); see *Pacific Custom Pools, Inc. v. Turner Construction Co.* (2000) 79 Cal.App.4th 1254, 1261 [94 Cal.Rptr.2d 756].)

with the policy of the License Law. As well as a short form of the business name, it gives the business's address, telephone number, and license number. The name on the contract—"Handyman Connection"—was not a departure from but was rather an abbreviation of the contractor's full legal name. It was as if a contract had said "Sears" rather than "Sears Roebuck and Company, Inc." A customer checking on Handyman's legal status and qualifications would not have been misled by this information. And there is no evidence that Handyman's performance would have differed if its full business name had been printed on the "Labor Estimate." (In fact, that name more closely resembles the name on the contract than the plaintiff's business name in *Asdourian, supra*, 38 Cal.3d 276 [211 Cal.Rptr. 703], resembled the personal name he used on his contracts.)

Like the court in *Asdourian, supra*, 38 Cal.3d 276, we see section 7117 as in pari materia with section 7031. Therefore, we find that *Asdourian's* reasoning applies to section 7117. "Statutes in pari materia should be construed together. [Citation.]" (*Long Beach Police Officers Assn. v. City of Long Beach* (1988) 46 Cal.3d 736, 744 [250 Cal.Rptr. 869, 759 P.2d 504].) As in *Asdourian*, the violation charged here amounted to a mere technicality, and upholding it would not serve the purpose of the License Law.

The citation should not have been sustained as to Item No. 2. Because the $350 penalty imposed below included $50 for this alleged violation, remand to the Board will be required.

### C. *Item No. 3 (employing unregistered home improvement salesperson)*

"A home improvement contractor who employs a person to sell home improvement contracts while such person is not registered by the registrar as a home improvement salesman as provided in this article, is subject to disciplinary action." (§ 7154.)

It is undisputed that Gary Bon was not registered as a home improvement salesperson, although he acted as Handyman's agent in negotiating and executing the Myhres project. However, Handyman contends he came within two statutory exceptions to the registration requirement. Handyman is wrong.

Section 7152 provides as relevant:

"(a) 'Home improvement salesperson' is a person employed by a home improvement contractor licensed under this chapter to solicit, sell, negotiate, or execute contracts for home improvements, [or] for the sale, installation or furnishing of home improvement goods or services, . . .

"(b) The following shall not be required to be registered as home improvement salespersons:

"[¶] . . . [¶]

"(2) A qualifying person, *as defined in Section 7068.*

"[¶] . . . [¶]

"(5) A bona fide service repairperson who is in the employ of a licensed contractor and whose repair or service call is limited to the service, repair, or emergency repair initially requested by the buyer of the service." (Italics added.)

Section 7068, which forms part of article 5 ("Licensing") of the License Law, provides as relevant:

"(a) The board shall require an applicant [for a contractor's license] to show such degree of knowledge and experience in the classification applied for, and such general knowledge of the building, safety, health, and lien laws of the state and of the administrative principles of the contracting business as the board deems necessary for the safety and protection of the public.[22]

"(b) An applicant shall qualify in regard to his or her experience and knowledge in one of the following ways:

"(1) If an individual, he or she shall qualify by personal appearance or by the appearance of his or her responsible managing employee who is qualified for the same license classification as the classification being applied for.

"[¶] . . . [¶]

"(3) If a corporation, or any other combination or organization, it shall qualify by the appearance of a responsible managing officer or responsible managing employee who is qualified for the same license classification as the classification being applied for."

*The "qualifying person" exception*

Handyman asserts that, as a licensed contractor, Gary Bon was a "qualifying person" under section 7152, subdivision (b)(2). We disagree. Handyman's

---

[22] Contractors are classified as specialty contractors, general engineering contractors, or general building contractors. (§§ 7055–7058; Cal. Code Regs., tit. 16, §§ 830–832.) Contractors are generally permitted to do contracting work only in the classification or classifications in which they are licensed. (§ 7059, subd. (a); Cal. Code Regs., tit. 16, § 830, subd. (b).)

interpretation of the key words "as defined in Section 7068" ignores a significant part of the statute and its implementing regulations. Handyman's interpretation would also introduce an absurdity into the License Law and controvert its purpose.

When interpreting the term "qualifying person," the obvious question is: "Qualifying for what?" Nothing in section 7152, standing alone, answers that question. To do so we must examine the provision together with section 7068.

Handyman asserts that section 7068 states "in pertinent part": "(b) an applicant shall **qualify** in regard to his or her experience and knowledge in one of the following ways; (1) if an individual, he or she shall qualify by personal appearance . . . ." (Boldface and underscoring added by Handyman.) Based only on this portion of section 7068, Handyman concludes that because Bon qualified for his license in this way, he comes within section 7152, subdivision (b)(2).[23] We disagree.

First, Handyman ignores section 7068, *subdivision (a),* which explains what an applicant seeks to qualify *for* and how his knowledge and experience qualify him: "The board shall require an applicant to show such degree of knowledge and experience *in the classification applied for . . . as the board deems necessary for the safety and protection of the public."* (Italics added.) As noted above—and as Handyman has omitted to mention in all its pleadings throughout this case—Bon has applied for and received a license *only in the specialty classification of glazing.* (Cf. §§ 7055–7058; Cal. Code Regs., tit. 16, §§ 830, 832.)

We think the Legislature exempted "[a] qualifying person, as defined in Section 7068" from the registration requirement because when a seller of home improvements is licensed to do the work contracted for, the buyer can reasonably feel confident that the seller has accurately assessed and described the work required and will perform it competently at a fair price. When the salesperson is not licensed to do the work, the buyer can have no such confidence; thus such persons must be regulated in some other way for buyers' protection.

Bon's license protects the public when he performs as a glazier. It does not do so when he performs flooring installation work for which he is not licensed. Thus it makes no sense to conclude that merely because Bon holds a license in a specialty unrelated to the work he sold the Myhreses and then undertook to perform, he need not register as a home improvement salesperson.

---

[23] Handyman also cites the opinion of its "acknowledged expert in licensing," Richard Pires, who interpreted the statutes thus at the administrative hearing. Exercising our independent judgment on this legal question, we do not defer to Pires's opinion.

Handyman also ignores a significant part of section 7068, subdivision (b). The provisions immediately following subdivision (b)(1) (the only part Handyman quotes) explain how businesses applying for contractors' licenses must "qualify." In particular, subdivision (b)(3) states: "If a corporation . . . , it shall qualify *by the appearance of a responsible managing officer or responsible managing employee who is qualified for the same license classification as the classification being applied for.*" (Italics added.) When Handyman applied for its corporate contractor's license, it qualified through an officer or employee entitled to a license in the classification (general building contractor) for which Handyman sought licensing.[24] Bon did not and could not have qualified Handyman for its license, as he was neither a "responsible managing officer or responsible managing employee" nor the holder of a general contracting license. Therefore he is not "a qualifying person, as defined in Section 7068," *with respect to Handyman.* For this reason also it would not serve the purpose of the License Law to exempt him from registering as a home improvement salesperson when he works in that role for Handyman.

■ Handyman's interpretation of the "qualifying person" exemption, for which it cites no authority, misreads the statutory language. Moreover, to permit contractors acting as unregistered home improvement salespersons to sell projects they are not personally qualified to carry out would expose the public to the sort of sharp practice the registration requirement was meant to guard against. For both reasons, we reject Handyman's position.

### *The "service repairperson" exception*

Handyman also asserts Bon was not required to register as a home improvement salesperson because he acted as "[a] bona fide service repairperson who is in the employ of a licensed contractor and whose repair or service call is limited to the service, repair, or emergency repair initially requested by the buyer of the service." (§ 7152, subd. (b)(5).) We disagree.

This provision does not define its key terms. To construe them, therefore, we look first to their use in related statutes.

The definition of "home improvement" in section 7151 includes in the alternative: (1) "the *repairing, remodeling, altering, converting, or modernizing of, or adding to,* residential property," and (2) "*the installation of home improvement goods or the furnishing of home improvement services.*" It adds: "For purposes of this chapter, 'home improvement goods or services' means goods and services, *as defined in Section 1689.5 of the Civil Code,* which are

---

[24] Handyman's CEO, McGreevy, testified that Handyman's "qualifying person" (§ 7152, subd. (b)(2)) was John Scott, a licensed general contractor.

bought in connection with the improvement of real property . . . . Home improvement goods include goods which are to be so affixed to real property as to become a part of real property whether or not severable therefrom." (Italics added.)

As previously noted, a "home improvement salesperson" is a person employed by a licensed contractor "to solicit, sell, negotiate, or execute contracts for home improvements, for the sale, installation, or furnishing of home improvement goods or services . . . ." (§ 7152, subd. (a).)

As previously noted, "goods" and "services" have the following definitions in Civil Code section 1689.5:

"(c) 'Goods' means tangible chattels bought for use primarily for personal, family, or household purposes, . . . and including goods that, at the time of the sale or subsequently, are to be so affixed to real property as to become a part of the real property whether or not severable therefrom . . . .

"(d) 'Services' means work, labor and services, including, but not limited to, services furnished in connection with *the repair, restoration, alteration, or improvement* of residential premises . . . ." (Italics added.)

"Repair" is not defined in the License Law or in any related statute. Therefore we give the term its ordinary meaning. (*California School Employees Assn. v. Governing Board, supra,* 8 Cal.4th 333, 338.) According to a standard dictionary, "repair" means "**1a**: to restore by replacing a part or putting together what is torn or broken: FIX, MEND . . . **b**: to restore to a sound or healthy state: RENEW, REVIVIFY . . . **2**: to make good: REMEDY . . . . **3**: to make up for: compensate for . . . ." (Webster's Third New Internat. Dict. (1993), p. 1923.) According to a legal dictionary, "repair" means "[t]o mend, remedy, restore, renovate. To restore to a sound or good state after decay, injury, dilapidation, or partial destruction." (Black's Law Dict. (6th ed. 1990), p. 1298.)

 We presume the Legislature intends every word in a statute to have meaning, with nothing superfluous or redundant. (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].) In this light, we observe that as to home improvement goods and services the Legislature has distinguished "repair" from "restoration, alteration, or improvement" (Civ. Code, § 1689.5, subd. (d)), and "repairing" from "altering, converting, or modernizing of, or adding to" (§ 7151). Thus, the Legislature evidently did not intend these terms to be exact synonyms.

Furthermore, the ordinary meaning of "repair" entails fixing what is broken or healing what is injured. The other terms used in these statutes do not

necessarily convey that meaning. For instance, one can "restore" a structure or part of a structure by refitting it for its original use, even though nothing in its present state is broken or unsound. Similarly, one can "alter[]," "convert[]," "moderniz[e]," or "add[] to" a structure without having to fix anything broken.

Similarly, the "service" performed by a "service repairperson" is the servicing of an existing product, such as a furnace or air conditioner.

This construction of the statute would seem to make sense from a practical point of view. The statute appears to exempt from registration those "bona fide" repair people who come to one's home to fix something that is broken or to service an existing product. We think the Legislature probably had in mind that it would be nonsensical to require a homeowner to have his basement fill up with water from a broken water heater because a registered salesperson could not be located.[25]

■ Here, the Myhreses did not want to repair or service anything, but to alter or modernize conditions in their home. They did not want their "well-worn" carpeting refurbished and restored to its former state; they wanted to replace it in the master bedroom and hallway with a different kind of flooring.[26] Therefore they called Handyman to do the job that Gary Bon described in all the documents he prepared as "install hardwood flooring."[27] Bon was not called to carry out a repair and did not make one. Thus, the exemption from registration as a salesperson set out in section 7152, subdivision (b)(5), for a "bona fide service repairperson" does not apply. (As the trial court observed, the salient statutory distinction is not between "service" and "repair," but between "home improvement salesperson" and "service repairperson.")

---

[25] Handyman filed a motion in this court requesting judicial notice of a packet of material supplied by Legislative Intent Service, which Handyman characterized as the legislative history of the statute, and which was judicially noticed by the ALJ—but not by the trial court. We denied the motion because the packet consists primarily of material that is not cognizable as valid indicia of legislative intent, such as letters by supporters and opponents of bills (see *Peltier v. McCloud River R.R. Co.* (1995) 34 Cal.App.4th 1809, 1820 [41 Cal.Rptr.2d 182]), and enrolled bill reports. (*People v. Patterson* (1999) 72 Cal.App.4th 438, 444 [84 Cal.Rptr.2d 870].) We have examined the documents constituting properly cognizable legislative history and have concluded they shed no light on the questions of statutory interpretation that we must resolve.

[26] The carpeting remains in place in the other bedrooms.

[27] Handyman introduced an exhibit at the hearing, captioned, "Item Detail (WorkOrder) 6/8/01," which apparently records a telephone conversation between a Handyman employee and Jo-Ann Myhres on that date. This exhibit labels the job "REPAIR FLOOR & INSTALL— HARDWOOD FLOOR." However, no document prepared by Handyman at the time of the project uses the term "repair floor," and no other evidence supports that characterization of Bon's work.

Handyman asserts to the contrary that it merely "complet[ed] the *flooring repair project* started by [the Myhreses]. It's [*sic*] obvious that the work was performed to restore the floor and house to a good and sound state. This was not an installation of some new fixture or device into an area that did not need to be restored." (Italics added.) As there is no evidence the "floor and house" needed to be "restored" before the project began, we presume Handyman means that once the Myhreses had removed the carpeting to prepare for Bon's installation job the area could not remain without floor covering. But this is no different from any other case where people upgrade their homes by replacing perfectly sound fixtures with others they deem more attractive or up-to-date. Thus, for instance, if a homeowner opts to replace a structurally sound but drab composition roof with a tile or shingle roof, the old roof must come off to make way for the new. That does not make the upgrade a "repair" in any normal use of the English language, even though the house may be roofless until the job is done.

Handyman also analogizes its installation job to projects such as "an upgrade from a cheap leaking faucet to an expensive water[-]softening faucet" or replacing a "destroyed" Formica kitchen countertop with a Corian countertop. The adjectives give the game away. What is leaking or destroyed needs repair, and whether the repair includes replacing the old item with a more expensive model is immaterial. Here, the Myhreses did not seek to replace old carpeting with new—they sought to replace one kind of flooring with another. Moreover, though the carpeting was worn, there is no evidence it was unusable or fundamentally flawed.

### *The Board's alleged misinterpretations of section 7152*

Handyman asserts that the Board has manufactured an "installation exception" to the registration requirements—i.e., that if a project involves an installation it cannot be a repair within the meaning of section 7152. Handyman specifically claims that "[t]he agency" or its representatives testified to this purported exception. Yet Handyman does not provide any record citations to the alleged testimony. We therefore disregard Handyman's claim. (Cal. Rules of Court, rule 14(a)(1)(C); *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239 [126 Cal.Rptr.2d 178].)

Handyman also takes issue with the Board's interpretation of section 7152, subdivision (b)(5), because the Board's Chief of Enforcement, David Fogt, supposedly defined "service" and "repair" in his testimony in ways that go beyond their statutory and dictionary meanings. But since these terms are not defined in section 7152, subdivision (b)(5), and "repair" is not defined anywhere in the License Law, any interpretation of the terms must go beyond the statute itself. And a dictionary definition, though always a good starting

point, does not necessarily settle how the Legislature meant a term to be understood within a statutory scheme. In any event, because the Board is charged with enforcing the statute and presumably has expertise in this field, its interpretation deserves some degree of deference. (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at pp. 11–15.)[28]

Handyman calls the Chief of Enforcement's explanation of "service"— "performing service to something that already exists, to continue for that product or that material to continue to be viable"—"an obvious alteration of the statutory definition of the term 'service.' " We disagree. It is a reasonable elucidation of the term in context that correctly distinguishes it from the installation of new materials in a home improvement project.

Handyman also asserts that as to "repair" the Board ignores the dictionary definition "and imposes a limitation not found in the statute or any case law that the restoration must be with a like-kind material." Handyman fails to support this assertion with record citation. Therefore, we disregard it. (Cal. Rules of Court, rule 14(a)(1)(C); *City of Lincoln v. Barringer, supra,* 102 Cal.App.4th 1211, 1239.)

Handyman asserts more broadly that the Board's interpretations of section 7152, subdivision (b)(2) and (5), by grafting new provisions onto the statute, unconstitutionally usurp the Legislature's lawmaking powers in violation of substantive due process. We disagree. As we have shown, the Board's interpretations of both provisions are clearly in keeping with their language and purpose.

### No "rule of lenity" in administrative law; regulatory statutes not contracts of adhesion

Handyman asserts that we must construe any ambiguity in the statutory scheme in Handyman's favor. Handyman is wrong.

In effect, Handyman urges us either to import the so-called "rule of lenity" from criminal law into civil administrative law, or to treat occupational regulatory statutes as contracts of adhesion to which licensees are involuntary parties. To do either would be unwarranted. Because regulatory statutes like the License Law are intended to protect the public, it is the public, not the licensee, that deserves the benefit of any doubt.

---

[28] Handyman cites this decision as holding at pages 9 through 11 that "the agency's 'litigation position' is not given any special judicial deference beyond that which is usually afforded any expert witness." We do not find this proposition stated at the cited pages.

Handyman purports to rely on *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763 [72 Cal.Rptr.2d 624, 952 P.2d 641] (*Hughes*). *Hughes* is controlling authority *against* Handyman.

In *Hughes, supra,* 17 Cal.4th 763, the Board of Architectural Examiners revoked the plaintiff's license for professional misconduct that occurred in another jurisdiction before the plaintiff had obtained his license here. (*Id.* at pp. 768–772.) The controlling statutes (§§ 5583–5584) specified only that "in the practice of architecture, the holder of a license" who "has been guilty" of misconduct can be disciplined. (*Hughes, supra,* 17 Cal.4th at p. 774.) The plaintiff maintained (and the Court of Appeal held) that the agency could not discipline him for the alleged misconduct because he was not the "holder of a license" when he committed it. (*Id.* at pp. 774–775.) The Supreme Court disagreed.

The court reasoned as follows: The statutes do not expressly authorize the Board of Architectural Examiners to discipline a licensee based on misconduct arising prior to licensure, but also do not expressly forbid it to do so. (*Hughes, supra,* 17 Cal.4th 763, 776.) The Legislature's use of the past tense ("has been guilty") renders it likely that the statutes were meant to cover conduct prior to licensure—but this fact, standing alone, does not "appear to negate the plausibility of the opposite interpretation." (*Ibid.*) Being capable of contrasting reasonable interpretations, the statutes are ambiguous. (*Ibid.*) To resolve the ambiguity, we must look to the statutory scheme pertaining to architectural licensing and to "the broader statutory scheme pertaining to business and professional licenses generally." (*Id.* at pp. 776–780.) We must also look to the legislative history of the statutes, including their historical development. (*Id.* at pp. 780–783.) In addition, we must look to the statutes' purpose—which, as with occupational and professional licensing statutes in general, is to protect the public. (*Id.* at pp. 784–788.) Finally, we must construe the statutes in a manner consistent with the presumption that the Legislature intended them to be constitutional. (*Id.* at pp. 788–793.)

Having used all of these aids to construing the statutes, the court concluded that they authorize the Board of Architectural Examiners to discipline a licensee for misconduct prior to licensure. (*Hughes, supra,* 17 Cal.4th 763, 777–793, 795.) In short, faced with an agency disciplinary action based on statutes that were ambiguous on their face, the court resolved the ambiguity against the licensee and in favor of the agency's power to impose discipline for the public's protection.

In light of *Hughes, supra,* 17 Cal.4th 763, Handyman's claim that it deserves the benefit of any ambiguity in the License Law is untenable. As an occupational licensee, Handyman is not similarly situated to a criminal

defendant who faces the potential loss of life or liberty, or the signer of a contract of adhesion who cannot negotiate any change in its terms. Rather, it holds a license to practice an occupation requiring professional expertise, on condition that it not use that expertise to gain an unfair edge over customers. Because it is more sophisticated in the subject matter of its transactions than most members of the public, it is more closely analogous to an insurer, whose expertise gives it the advantage in negotiating a contract of insurance, than to the insured who signs the contract and gets the benefit of any ambiguity therein.

We hold the trial court properly concluded that, in performing his work for the Myhreses, Handyman's employee, Gary Bon, was not acting as a "bona fide service repairperson" and was therefore not exempt from registering as a "home improvement salesperson."

### D. *Item No. 4 (failure to comply with section 7159)*

It is undisputed that the "Labor Estimate," which the ALJ, the trial court, and this court have found to be the real contract in this case, did not contain the notices and other provisions required by section 7159, as charged in Item No. 4 of the citation. Handyman reiterates to the contrary that we must construe the subsequent "Agreement," which according to Handyman complies fully with the statute, as the true contract. We have already explained why we disagree.

Handyman also asserts, however: (1) The License Law permits a home improvement contract to consist of more than one document. (2) The "Agreement" incorporates the "Labor Estimate," in effect making both documents together "the contract." (3) Thus, even if the "Labor Estimate" standing alone does not comply with section 7159, the defect is immaterial because the "Agreement," which incorporates the "Labor Estimate," does comply with the statute. This argument lacks merit because its second premise is incorrect.

Handyman relies on the following portion of section 7159: "The writing shall be legible *and shall be in a form that clearly describes any other document which is to be incorporated into the contract.*" (§ 7159, subd. (m); italics added.) In addition, Handyman relies on the definition of "home improvement contract" as "an agreement, whether oral or written, *or contained in one or more documents . . . .*" (§ 7151.2; italics added.) But Handyman does not cite any authority holding that the second document a contractor presents to a customer before starting work incorporates the first as a matter of law, and we have not found any such authority. As a matter of fact, the "Agreement" does not "incorporate[]" the "Labor Estimate" because

it does not "clearly describe[]" that document (or even mention it). Because the "Agreement" (assuming Handyman meant it to be the contract) did not comply with section 7159 in this respect, section 7151.2 does not assist Handyman.

Handyman asserts that, by finding the "Labor Estimate" to be the true contract, the ALJ and the trial court "ignore[d] the *Parol Evidence Rule*." Handyman fails to explain this bare assertion, to give any record citation that might elucidate it, or to cite any authority other than the statute defining the parol evidence rule. Therefore we disregard this point. (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *Troensegaard v. Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 228 [220 Cal.Rptr. 712].)

Handyman also asserts that the "Labor Estimate" standing alone cannot be the true contract because section 7159 contains a "triggering prerequisite that some work be done." However, Handyman cites nothing in section 7159 or in any case law construing it to explain this assertion. Therefore we disregard this point as well. (*Amato v. Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1794 [23 Cal.Rptr.2d 73].) In any event, as explained in part IV.A. of this discussion, the "Labor Estimate" contained all the elements of a home solicitation contract, albeit one that did not comply with all the statutory requirements for such a contract.

Because the "Agreement" is irrelevant to the charge made in Item No. 4 of the citation and sustained by the trial court, we do not address Handyman's arguments as to whether the notices given in the "Agreement" complied with section 7159.

# V

## Constitutional claims

As it did below, Handyman contends that its constitutional rights are being violated because the Board's action infringed its vested right to earn a livelihood and violated equal protection. We have already determined that the Board's action did not infringe any fundamental vested right. We now briefly address the equal protection claim.

Handyman asserts: (1) The Board has said it will not file "ticky-tack," "forms," or "technical" violations. (2) It is undisputed that no injury to the public occurred here. (3) The testimony showed that less than 50 percent of home improvement contractors' contracts comply with the License Law, yet "[t]ypically" those in violation receive only warning letters. (4) Handyman

performs thousands of jobs every year and is never accused of workmanship or "non-technical" violations; thus this citation is "a blemish to" Handyman's reputation. Handyman fails to support any of these points other than point (1) with citation to the record. Therefore, the argument is forfeited. (Cal. Rules of Court, rule 14(a)(1)(C); *City of Lincoln v. Barringer, supra,* 102 Cal.App.4th 1211, 1239.)

## DISPOSITION

Except as to Item No. 2 of the citation, the judgment is affirmed. As to Item No. 2, the judgment is reversed. The matter is remanded to the trial court with directions to issue a writ of mandate commanding the Board to (1) vacate its finding that Handyman violated Item No. 2 of the citation and (2) reduce the penalty against Handyman from $350 to $300. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 27(a)(4).)

Morrison, J., and Robie, J., concurred.

## APPENDIX A

BOARD'S EXH. 4.
"LABOR ESTIMATE"

# Handyman
## CONNECTION.
## Labor Estimate

9722 Fair Oaks Blvd., Suite E
Fair Oaks, CA 95628
(916) 863-6633
Fax (916) 863-6634
Lic. #726641

Customer will Supply and Pay for All Materials Separate from Labor

NAME _Mrs. MYHRES_
STREET _DORINDA WAY_
_MICHAEL_ STATE _Co._ ZIP CODE _95608_
WORK PHONE HOME PHONE _961-0889_

This estimate is for completing the job as described below. It is based on our evaluation and does not include additional labor and materials which may be required should unforeseen problems arise after the work has started.

**ACCEPTANCE OF PROPOSAL**
The specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payment will be made upon completion.

PREPARED BY _GARY BON_ DATE _3/20/99_
APPROVED BY _____ DATE

| NO. | DESCRIPTION | LABOR REQUIREMENTS |
|---|---|---|
| | Install Hardwood | |
| | Flooring Master | |
| | Bed Room and | |
| | Hallway. | |
| | 277 # | |
| | | |
| | Labor cost | |
| | # 2590.00 | |
| | N.B. ... | |

**MAKE CHECKS PAYABLE TO HANDYMAN CONNECTION.**

REMARKS

STATE'S EXHIBIT

| | LABOR COST | |
|---|---|---|
| | NO MORE THAN | AS LOW AS |
| GROSS | 2960.00 | GROSS 2740.00 |
| COUPON | 150.00 | COUPON 150.00 |
| NET | 2810.00 | NET 2590.00 |
| | | SURVEY 3610.00 |

Handyman connection™ home repair connection™ All rights reserved including the right of reproduction in whole or in part, in any form, in any manner and by any means.
Form #4B - Rev 7/97 WHITE : HANDYMAN CONNECTION YELLOW. CRAFTSMAN PINK: CUSTOMER

## APPENDIX B

Handyman Connection of Sacramento DBA:

**Handyman CONNECTION**
9722 Fair Oaks Blvd., Suite E
Fair Oaks, CA 95628
(916) 863-6633
Contractor's Lic. # 726641

_GARY BON_
Date _4/19/99_
Approximate Starting Date _4/19/99_
Approximate Substantial Completion Date _4/29/99_
Terms: ☐ Cash ☑ Check

Name: _MR. + MRS. MYHRES_ Contract No. _4820_
Address: _6447 DORINDA WY._ Job Address: _SAME_
City _CARMICHAEL_ Zip _95608_
Area Code _916_ Home Phone _961-0889_ Work Phone

This Agreement is between HANDYMAN CONNECTION OF SACRAMENTO, INC.
(HANDYMAN) and _MR + MRS. MYHRES_ (OWNER).
HANDYMAN will provide all of the LABOR required to complete the following work:

_INSTALL HARDWOOD FLOORING_
_MASTER BED ROOM AND HALLWAY._
_277 Φ._

Additional description of work is set forth on the Supplement to Contract.

OWNER WILL SUPPLY AND PAY FOR ALL MATERIALS REQUIRED TO COMPLETE THIS WORK SEPARATE FROM THE LABOR PRICE.

PAYMENT: OWNER agrees to pay to Handyman a total cash price of:

ALL CHECKS MUST BE PAYABLE TO HANDYMAN CONNECTION TO VALIDATE OUR GUARANTEE FOR THIS CONTRACT.

| | No More Than | As Low As |
|---|---|---|
| Gross | 2960.00 | 2740.00 |
| Coupon | 150.00 | 150.00 |
| Net | 2810.00 | 2590.00 |

STANDARD TERMS:

1. The Independent Contractor doing this work is not authorized to make any representations or agreements other than those set forth in writing in this Agreement, and any such representations are hereby disclaimed.
2. All changes to the work or terms of this Agreement shall be in writing on a HANDYMAN CONNECTION CHANGE ORDER dated and signed by the Independent contractor and OWNER describing the work and setting the labor price for such work.
3. OWNER shall obtain and pay for all necessary building permits and shall pay for any work required by any building inspector as a condition for approval of the work.
4. All manufacturers' warranties will be delivered to the OWNER
5. All work to be completed in a workmanlike manner according to standard trade practices
6. All additional work or changes required by any building inspector, or because of unforeseen, unknown or undisclosed conditions will become an extra cost and shall be done only after OWNER and the Independent contractor have dated and signed a HANDYMAN CONNECTION CHANGE ORDER describing the work and setting the labor price for such work.
7. OWNER is advised and understands that performance of this work is subject to the existing conditions and the typical limitations of repairs for retouching paint, texture or other existing conditions. HANDYMAN will take ordinary trade practice efforts to achieve a reasonable match as permitted by existing conditions, however an exact match or not visible match is not promised or guaranteed
8. Failure to substantially commence work without lawful excuse, within twenty (20) days from the approximate starting date set forth above is a violation of the Contractor's License Law. Demolition or removal of existing conditions constitutes substantial commencement of work.

CONTRACTORS ARE REQUIRED BY LAW TO BE LICENSED AND REGULATED BY THE CONTRACTOR'S STATE LICENSE BOARD WHICH HAS JURISDICTION TO INVESTIGATE COMPLAINTS AGAINST CONTRACTORS IF A COMPLAINT REGARDING A PATENT ACT OR OMISSION IS FILED WITHIN FOUR YEARS OF THE DATE OF THE ALLEGED VIOLATION. A COMPLAINT REGARDING A LATENT ACT OR OMISSION PERTAINING TO ANY STRUCTURAL DEFECTS MUST BE FILED WITHIN 10 YEARS OF THE DATE OF THE ALLEGED VIOLATION. ANY QUESTIONS CONCERNING A CONTRACTOR MAY BE REFERRED TO THE REGISTAR, CONTRACTORS' STATE LICENSE BOARD, P.O. BOX 2630, AND SACRAMENTO, CALIFORNIA 95826.

YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT. YOU THE HOMEOWNER (BUYER) OR TENANT HAVE THE RIGHT TO REQUIRE THE CONTRACTOR TO FURNISH YOU WITH A PERFORMANCE BOND, HOWEVER THE CONTRACTOR CAN REQUIRE YOU TO PAY FOR THAT BOND.

Owner acknowledges receipt of a Notice To Owner, Notice required by Business and Professions Code section 7030, and a Notice of Cancellation.

X _____ Date _4-19-99_ Handyman Connection of Sacramento, Inc. Date
Owner

WHITE Office Copy YELLOW, Independent Contractor's Copy PINK Customer's Copy

APPENDIX B

## NOTICE TO OWNER

*NOTE: Prior to signing this contract the owner must read and sign this Notice.*

Under The California Mechanics' Lien Law any contractor, subcontractor, laborer, supplier or other person or entity who helps to improve your property, but is not paid for his/her work or supplies, has a right to place a lien on your home, land, or property where the work was performed and to sue you in court to obtain payment. This means that after a court hearing, your home, land, and property could be sold by a court officer and the proceeds of the sale used to satisfy what you owe. This can happen even if you have paid your contractor in full if the subcontractors, laborers or suppliers remain unpaid.

To preserve their right to file a claim or lien against your property, certain claimants such as subcontractors or material suppliers are each required to provide you with a document called a "Preliminary Notice." Contractors and laborers who contract with owners directly do not have to provide such notice since you are aware of their existence as an owner. A preliminary notice is not a lien against your property. Its purpose is to notify you of persons or entities that may have a right to file a lien against your property if they are not paid. In order to perfect their lien rights, a contractor, subcontractor, supplier, or laborer must file a mechanic's lien with the county recorder which then becomes a recorded lien against your property. Generally, the maximum time allowed for filing a mechanics' lien against your property is 90 days after substantial completion of your project.

TO INSURE EXTRA PROTECTION FOR YOURSELF AND YOUR PROPERTY, YOU MAY WISH TO TAKE ONE OR MORE OF THE FOLLOWING STEPS:

(1) Require that your contractor supply you with a payment and performance bond (not a license bond), which provides that the bonding company will either complete the project or pay damages up to the amount of the bond. This payment and performance bond as well as a copy of the construction contract should be filed with the county recorder for your further protection. The payment and performance bond will usually cost from 1 to 5 percent of the contract amount depending on the contractor's bonding ability. If a contractor cannot obtain such bonding, it may indicate his or her financial incapacity.

(2) Require that payments be made directly to subcontractors and material suppliers through a joint control. Funding services may be available, for a fee, in your area which will establish voucher or other means of payment to your contractor. These services may also provide you with lien waivers and other forms of protection. Any joint control agreement should include the addendum approved by the registrar.

(3) Issue joint checks for payment, made out to both your contractor and subcontractors or material suppliers involved in the project. The joint checks should be made payable to the persons or entities which send preliminary notices to you. These persons or entities have indicated that they may have lien rights on your property, therefore you need to protect yourself. This will help to insure that all persons due payment are actually paid.

(4) Upon making payment on any completed phase of the project, and before making any further payments, require your contractor to provide you with unconditional "Waiver and Release" forms signed by each material supplier, subcontractor and laborer involved in that portion of the work for which payment was made. The statutory lien releases are set forth in exact language in Section 3262 of the Civil Code. Most stationery stores will sell the "Waiver and Release" forms if your contractor does not have them. The material suppliers, subcontractors, and laborers that you obtain releases from are those persons or entities who have filed preliminary notices with you. If you are not certain of the materials suppliers, subcontractors, and laborers working on your project, you may obtain a list from your contractor. On projects involving improvements to a single family residence or duplex owned by individuals, the persons sign these releases lose the right to file a mechanics' lien claim against your property. In other types of construction, this protection may still be important, but may not be as complete.

To protect yourself under this option, you must be certain that all material suppliers, subcontractors, and laborers have signed the "Waiver and Release" form. If a mechanics' lien has been filed against your property, it can only be voluntarily released by a recorded "Release of Mechanics' Lien" signed by the person or entity that filed the mechanics' lien against your property unless the lawsuit to enforce the lien was not timely filed. You should not make any final payments until any and all such liens are removed. YOU SHOULD CONSULT AN ATTORNEY IF A LIEN IS FILED AGAINST YOUR PROPERTY

## NOTICE OF RIGHT TO CANCEL

### Notice of Cancellation – Notice of Rescission

*(California Civil Code 1689.7)*

NAME _____ CONTRACT NO _____

ADDRESS _____ TRANSACTION DATE. _____

CITY _____ STATE _____ ZIP _____

**YOU MAY CANCEL THIS TRANSACTION, WITHOUT PENALTY OR OBLIGATION, WITHIN THREE (3) DAYS FROM THE ABOVE TRANSACTION DATE**

NOTICE OF CANCELLATION:

You may cancel this transaction, without penalty or obligation, within three days from the above transaction date. If you cancel this home improvement contract, any payments made by you under the home improvement contract and any negotiable instrument executed by you will be returned within ten business days following receipt by the independent contractor of your cancellation notice, and any security interest arising out of the transaction will be cancelled. To cancel this transaction, mail or deliver a signed and dated copy of this cancellation notice or any other written notice of cancellation no later than _____ to:

Date

HANDYMAN CONNECTION I hereby cancel this transaction _____
9722 Fair Oaks Blvd., Ste E. Date
Fair Oaks, CA 95628
(916) 863-6633

_____
Customer's Signature

_____
Customer's Signature