[No. F052102. Fifth Dist. Mar. 27, 2008.]

PATTERSON FLYING SERVICE et al., Plaintiffs and Appellants, v. DEPARTMENT OF PESTICIDE REGULATION, Defendant and Respondent.

414

**COUNSEL**

Law Offices of William McPike and William McPike for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Tom Greene, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, and Russell B. Hildreth, Deputy Attorney General, for Defendant and Respondent.

**OPINION**

**HILL, J.**—Appellants appeal from the denial of their petition for writ of administrative mandamus. After a hearing by a hearing officer, the county agricultural commissioner imposed a fine on Patterson Flying Service for failing to follow the label directions when it made an aerial application of pesticides, in violation of Food and Agricultural Code section 12973. An appeal to the Director of the Department of Pesticide Regulation upheld the penalty. Appellants' petition to the trial court for an administrative writ of mandamus was denied. Appellants appeal that denial, contending the administrative proceedings failed to follow the proper procedures, and the commissioner's findings were not supported by substantial evidence. We will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The county agricultural commissioner (commissioner) issued a notice of proposed action, which notified Patterson Flying Service (Patterson) that the commissioner proposed to fine it $5,000 for violation of Food and Agricultural Code section 12973, which provides: "The use of any pesticide shall not conflict with labeling registered pursuant to this chapter which is delivered with the pesticide or with any additional limitations applicable to the conditions of any permit issued by the director or commissioner." The notice

asserted that, on September 2, 2005, Patterson, operating as a pest control business, made a pesticide application of Dimethoate, which drifted onto Elena Ruiz while on adjacent property. The notice asserted Patterson's failure to prevent offsite movement of the pesticide onto Ruiz's property and person resulted in an actual health hazard, warranting a "Class A" penalty under California Code of Regulations, title 3, section 6130, subdivision (a). The notice also asserted Patterson was liable to the individual harmed or the medical provider for the immediate costs of medical care for acute injuries or illnesses of the exposed individual. The notice stated Patterson was entitled to a hearing on request.

At appellants' request, a hearing was held before a hearing officer. The evidence indicated appellants applied both Dimethoate and a second pesticide, Warrior, to the field adjacent to Ruiz's property. The hearing officer made findings of fact and concluded the labels of the Dimethoate and Warrior pesticides stated: "Do not apply this product in a way that will contact workers or other persons, either directly or through drift." He also found substantial amounts of Dimethoate and Warrior drifted from the target site onto Ruiz and her property, and the violation of Food and Agricultural Code section 12973 created an actual health or environmental hazard, so that a $5,000 fine was appropriate. The commissioner adopted the hearing officer's decision, and ordered Patterson to pay the $5,000 fine and reimburse Ruiz for her medical costs.

Appellants appealed to the Director of the Department of Pesticide Regulation, who affirmed, concluding that the commissioner's decision was supported by substantial evidence and the penalty was within his discretion. Appellants petitioned the superior court for a writ of administrative mandamus. After a hearing, the court denied the petition, finding substantial evidence supported the commissioner's decision.

## *DISCUSSION*

In administrative mandate proceedings, the inquiry is "whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) In cases not involving a fundamental vested right,[1] where the

---

[1] Where the only sanction imposed is a fine, no fundamental vested right is implicated. (*Handyman Connection of Sacramento, Inc. v. Sands* (2004) 123 Cal.App.4th 867, 880 [20 Cal.Rptr.3d 727].) Neither party contends a fundamental vested right is implicated in this case.

appellant challenges the sufficiency of the evidence, the appellate court must determine from a review of the administrative record whether substantial evidence supports the agency's findings. (*Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94 Cal.App.4th 1048, 1077 [114 Cal.Rptr.2d 798].) The deferential "substantial evidence" standard requires the appellate court to presume the correctness of the administrative ruling. (*Ibid.*) Appellants contend respondent failed to proceed in the manner required by law because it failed to follow the procedures set out in the Administrative Procedure Act (Gov. Code, § 11340 et seq.). They also contend the evidence does not support the findings.

I. *Application of the Administrative Procedure Act*[2]

■ The administrative adjudicative provisions of the Administrative Procedure Act (APA) are found in chapters 4.5 (Gov. Code, § 11400 et seq.) and 5 (Gov. Code, § 11500 et seq.) of the APA. The formal hearing procedures of chapter 5 apply when by statute they are made applicable to an agency or proceeding. (Gov. Code, § 11501; *Cockshott v. Department of Forestry & Fire Protection* (2004) 125 Cal.App.4th 235, 239 [22 Cal.Rptr.3d 675].) Except as otherwise expressly provided by statute, the general provisions of chapter 4.5 apply to all agencies of the state; they apply to any decision by an agency if an evidentiary hearing for determination of facts is required for formulation and issuance of the decision. (Gov. Code, §§ 11410.10, 11410.20.) Chapter 4.5 does not apply to a local agency, unless it is made applicable by statute. (Gov. Code, § 11410.30, subd. (b).) Chapter 4.5 does apply, however, "to an agency created or appointed by joint or concerted action of the state and one or more local agencies." (Gov. Code, § 11410.30, subd. (c).) Appellants contend the provisions of the APA apply to the decision of the commissioner, because it is "an agency created or appointed by joint or concerted action of the state and one or more local agencies." Respondent contends the commissioner is a local agency to which the APA does not apply.

The parties have not cited, and we have not found, any case interpreting the phrase "an agency created or appointed by joint or concerted action of the state and one or more local agencies," as that phrase is used in Government Code section 11410.30. The Law Revision Commission comments to section

---

[2] Appellants' request for judicial notice, made on page 12 of their opening brief, is denied. (Cal. Rules of Court, rule 8.252(a); *Canal Ins. Co. v. Tackett* (2004) 117 Cal.App.4th 239, 243 [11 Cal.Rptr.3d 626].)

11410.30, however, state: "Local agencies are excluded because of the very different circumstances of local government units when compared to state agencies. The section explicitly includes joint state and local bodies, so as to effect the broadest possible coverage." (Cal. Law Revision Com. com., 32D West's Ann. Gov. Code (2005 ed.) foll. § 11410.30, p. 272.)

■ The APA defines " '[a]gency' " as "a board, bureau, commission, department, division, office, officer, or other administrative unit, including the agency head . . . ." (Gov. Code, § 11405.30.) ■ A " 'local agency' " is "a county, city, district, public authority, public agency, or other political subdivision or public corporation in the state other than the state." (Gov. Code, § 11410.30, subd. (a).) ■ Each county has a county department of agriculture, which is under the control of the county agricultural commissioner. (Food & Agr. Code, §§ 2001, 2002.) Generally, the commissioner is appointed by the county board of supervisors. (Food & Agr. Code, § 2121.) With some exceptions, a person cannot be appointed to the office of commissioner unless he or she is licensed by the state Secretary of Food and Agriculture. (Food & Agr. Code, § 2123.)

■ In any county in which no commissioner has served, the Secretary of Food and Agriculture performs "the duties of commissioner in the same manner, to the same extent, and with the same authority as if he had been the duly appointed commissioner in such county," except that the pesticide regulatory duties of the commissioner are performed by the Director of the Department of Pesticide Regulation as if he were the appointed commissioner. (Food & Agr. Code, § 2125; see Governor's Reorganization Plan No. 1 of 1991, § 16, eff. July 17, 1991, Deering's Ann. Food & Agr. Code (1997 ed.) § 2125.1.)[3] When the secretary learns of a vacancy in the office of commissioner, he or she must "immediately transmit to the board of supervisors . . . a list of persons who are licensed by him or her to be eligible for the position." (Food & Agr. Code, § 2151.) If the board of supervisors fails to appoint a commissioner, the secretary must appoint a commissioner from the list. (Food & Agr. Code, § 2152.) If there is no qualified person available for

---

[3] Generally, references to the "director" in the Food and Agricultural Code refer to the Secretary of Food and Agriculture. (Food & Agr. Code, § 50.) In 1991, however, the Department of Pesticide Regulation succeeded to the duties and powers of the Department of Food and Agriculture relating to the regulation of pesticides. (Governor's Reorganization Plan No. 1 of 1991, § 27, eff. July 17, 1991, Deering's Ann. Food & Agr. Code, *supra*, § 11454.) In the portions of the code relating to pesticide regulation, the term "director" now refers to the Director of the Department of Pesticide Regulation. (Food & Agr. Code, § 12500; Governor's Reorganization Plan No. 1 of 1991, § 39, eff. July 17, 1991, Deering's Ann. Food & Agr. Code, *supra*, § 12752.5.)

the office of commissioner, the board of supervisors may temporarily appoint a person recommended by the secretary. (Food & Agr. Code, § 2153.) The Secretary of Food and Agriculture and the Director of the Department of Pesticide Regulation are also involved in removing commissioners for neglect of duty, incompetence, or misconduct in office. (Food & Agr. Code, §§ 2181–2186.)

■ The commissioner must make annual reports to the director and attend any meeting the secretary and director require. (Food & Agr. Code, §§ 2272, 2275.) Commissioners may adopt regulations applicable in their counties governing the conduct of pest control operations, but each regulation must be approved by the director before it becomes operative. (Food & Agr. Code, §§ 11503, 11510.) "The director, and the commissioner of each county under the direction and supervision of the director, shall enforce this division [division 6, governing pest control operations] and the regulations which are issued pursuant to it." (Food & Agr. Code, § 11501.5.) "Except as otherwise specifically provided, in all cases where provisions of this code place joint responsibility for the enforcement of laws and regulations on the director and the commissioner, the commissioner shall be responsible for local administration of the enforcement program. The director shall be responsible for overall statewide enforcement and shall issue instructions and make recommendations to the commissioner. Such instructions and recommendations shall govern the procedure to be followed by the commissioner in the discharge of his duties. The director shall furnish assistance in planning and otherwise developing an adequate county enforcement program, including uniformity, coordination, training, special services, special equipment, and forms, state-wide publicity, statewide planning, and emergency assistance." (Food & Agr. Code, § 2281.)

■ " 'Agency' " includes an agency head, such as the county agricultural commissioner, who controls the county department of agriculture. (Gov. Code, §§ 11405.30, 11405.40; see Food & Agr. Code, § 2002.) The statutes cited above illustrate that the Secretary of Food and Agriculture and the Director of the Department of Pesticide Regulation are jointly involved with the board of supervisors in the appointment of the county agricultural commissioner. The secretary licenses eligible persons and provides a list of those eligible when a vacancy in the office occurs; if the board fails to fill the vacancy, the secretary makes the appointment from the list. The secretary and director are involved in removing incompetent commissioners; they must approve regulations

adopted by the commissioners, and they direct and supervise the commissioners' enforcement of statutes and regulations relating to pest control operations. ■ Under these statutes, the county agricultural commissioner is not an independent local agency, whose *very different circumstances* justify its exclusion from the procedural requirements of the APA. Rather, it is closely connected with state agencies that direct, supervise, and cooperate in the performance of its duties. We conclude the office of county agricultural commissioner is a local agency "created or appointed by joint or concerted action of the state and one or more local agencies" for purposes of Government Code section 11410.30, subdivision (c). Consequently, the provisions of chapter 4.5 of the APA apply to hearings conducted under the authority of the county agricultural commissioner.

■ The formal hearing procedures of chapter 5 of the APA apply only when the statutes relating to the agency so provide. (Gov. Code, § 11501; Cal. Law Revision Com. com., 32D West's Ann. Gov. Code, *supra*, foll. § 11501, p. 402.) The statute governing the hearing by the commissioner in this case did not require compliance with chapter 5 of the APA. (See Food & Agr. Code, § 12999.5.) Consequently, a formal hearing pursuant to chapter 5 of the APA was not required.

The statute under which the hearing was held set out the procedures to be followed by the commissioner and the procedures for appeal to the Director of the Department of Pesticide Regulation:

"(c) Before a civil penalty is levied, the person charged with the violation shall be given a written notice of the proposed action including the nature of the violation and the amount of the proposed penalty, and shall have the right to request a hearing within 20 days after receiving notice of the proposed action. . . . If a hearing is requested, notice of the time and place of the hearing shall be given at least 10 days before the date set for the hearing. At the hearing, the person shall be given an opportunity to review the commissioner's evidence and to present evidence on his or her own behalf. If a hearing is not timely requested, the commissioner may take the action proposed without a hearing.

"(d) If the person upon whom the commissioner levied a civil penalty requested and appeared at a hearing, the person may appeal the commissioner's decision to the director within 30 days of the date of receiving a copy of the commissioner's decision. . . ."[4] (Food & Agr. Code, § 12999.5, subds. (c), (d).)

---

[4] Subdivision (d) of Food and Agricultural Code section 12999.5 provides, in its entirety:

"(d) If the person upon whom the commissioner levied a civil penalty requested and appeared at a hearing, the person may appeal the commissioner's decision to the director

Under chapter 4.5 of the APA:

"(a) The governing procedure by which an agency conducts an adjudicative proceeding is determined by the statutes and regulations applicable to that proceeding. . . .

"(b) This chapter supplements the governing procedure by which an agency conducts an adjudicative proceeding." (Gov. Code, § 11415.10, subds. (a), (b).)

 Some provisions of chapter 4.5, such as its informal hearing procedures (Gov. Code, § 11445.10), are optional; they do not replace other agency procedures that serve the same purpose. (Cal. Law Revision Com. com., 32D West's Ann. Gov. Code, *supra*, foll. § 11415.10, p. 277.) Other provisions, such as the Administrative Adjudication Bill of Rights (Gov. Code, § 11425.10), are mandatory and govern any adjudicative proceeding to which

---

within 30 days of the date of receiving a copy of the commissioner's decision. The following procedures apply to the appeal:

"(1) The appeal shall be in writing and signed by the appellant or his or her authorized agent, state the grounds for the appeal, and include a copy of the commissioner's decision. The appellant shall file a copy of the appeal with the commissioner at the same time it is filed with the director.

"(2) The appellant and the commissioner may, at the time of filing the appeal or within 10 days thereafter or at a later time prescribed by the director, present the record of the hearing including written evidence that was submitted at the hearing and a written argument to the director stating grounds for affirming, modifying, or reversing the commissioner's decision.

"(3) The director may grant oral arguments upon application made at the time written arguments are filed.

"(4) If an application to present an oral argument is granted, written notice of the time and place for the oral argument shall be given at least 10 days before the date set therefor. The times may be altered by mutual agreement of the appellant, the commissioner, and the director.

"(5) The director shall decide the appeal on the record of the hearing, including the written evidence and the written argument described in paragraph (2), that he or she has received. If the director finds substantial evidence in the record to support the commissioner's decision, the director shall affirm the decision.

"(6) The director shall render a written decision within 45 days of the date of appeal or within 15 days of the date of oral arguments or as soon thereafter as practical.

"(7) On an appeal pursuant to this section, the director may affirm the commissioner's decision, modify the commissioner's decision by reducing or increasing the amount of the penalty levied so that it is within the director's guidelines for imposing civil penalties, or reverse the commissioner's decision. Any civil penalty increased by the director shall not be higher than that proposed in the commissioner's notice of proposed action given pursuant to subdivision (c). A copy of the director's decision shall be delivered or mailed to the appellant and the commissioner.

"(8) Any person who does not request a hearing pursuant to subdivision (c) may not file an appeal pursuant to this subdivision.

"(9) Review of a decision of the director may be sought by the appellant within 30 days of the date of the decision pursuant to Section 1094.5 of the Code of Civil Procedure."

chapter 4.5 applies. (Cal. Law Revision Com. com., 32D West's Ann. Gov. Code, *supra*, foll. § 11415.10, p. 277.)

■ Government Code section 11425.10 lists the requirements for an adjudicative proceeding under chapter 4.5. These requirements include giving the person subject to agency action "notice and an opportunity to be heard, including the opportunity to present and rebut evidence." (Gov. Code, § 11425.10, subd. (a)(1).) Section 11425.10 is self-executing; it applies to the governing procedure by which an agency conducts an adjudicative proceeding without further action by the agency, although the agency's procedure may include provisions equivalent to, or more protective of the rights of the person to which the agency action is directed than, the requirements of section 11425.10. (Gov. Code, § 11425.10, subd. (b); Cal. Law Revision Com. com., 32D West's Ann. Gov. Code, *supra*, foll. § 11425.10, p. 291.) Section 11425.10 specifies the minimum due process requirements for an adjudicative hearing subject to chapter 4.5 of the APA. (Cal. Law Revision Com. com., 32D West's Ann. Gov. Code, *supra*, foll. § 11425.10, p. 291.)

Accordingly, the procedures governing the hearing before the hearing officer concerning the commissioner's proposed penalty were those found in Food and Agricultural Code section 12999.5, subdivision (c), which were specifically applicable to that proceeding, supplemented by the mandatory provisions of chapter 4.5 of the APA. The procedure set out in Food and Agricultural Code section 12999.5, subdivision (c), and followed at the hearing provided appellants "notice and an opportunity to be heard, including the opportunity to present and rebut evidence." (Gov. Code, § 11425.10, subd. (a)(1).) Appellants do not clearly identify any procedure required by Food and Agricultural Code section 12999.5, subdivision (c) or chapter 4.5 of the APA, that they contend they were denied in the hearing before the hearing officer, nor do they explain how they were adversely affected by its absence. In their reply brief, they contend "the hearing was conducted pursuant to no judicially, statutory or regulatory recognizable procedures" and "[a] primary concern is the selection of the 'hearing officer' or 'Administrative Law Judge' pursuant to Gov. C[ode] Sec. 11502 (a)(b) for the conduct of [the] hearing."

As discussed previously, chapter 5 of the APA did not apply to the hearing. The provision in Government Code section 11502 requiring that hearings be conducted by administrative law judges on the staff of the Office of Administrative Hearings applies only to formal hearings pursuant to chapter 5 of the APA, and thus was not applicable to the hearing in issue. Consequently, appointment of an administrative law judge to conduct the hearing was not required.

Neither Food and Agricultural Code section 12999.5 nor chapter 4.5 of the APA prescribes the method by which the hearing officer is to be selected or appointed or the minimum qualifications the hearing officer must meet. Chapter 4.5 requires that the hearing officer be disinterested; it provides that the hearing officer may not be a person who served as investigator, prosecutor, or advocate earlier in the proceeding and that the hearing officer is subject to disqualification for bias, prejudice, or interest. (Gov. Code, §§ 11425.10, subd. (a)(4), (5), 11425.30, 11425.40.)

Appellants do not contend the hearing officer should have been disqualified on any of these grounds. Appellants contend that, if the APA did not apply, then the Government Code sections relating to county hearing officers applied to the subject hearing, and their requirements were not met. Government Code section 27720 authorizes any county to establish the office of county hearing officer, whose duties "are to conduct hearings for the county or any board, agency, commission, or committee of the county." (Gov. Code, § 27720.) "When a state law . . . provides that a hearing be held or that findings of fact or conclusions of law be made by any county board, agency, commission, or committee, the county hearing officer may be authorized by ordinance or resolution to conduct the hearing . . . ." (Gov. Code, § 27721.) A county hearing officer must be an attorney who was admitted to practice at least five years before appointment to that office. (Gov. Code, § 27724.) These provisions "provide an alternative to, and do not supersede, any other provision of law providing for any matter to be heard or determined by a hearing officer." (Gov. Code, § 27728.)

Appellants have not demonstrated that the county hearing officer provisions applied to their hearing, or that there was any failure to comply with them. The county *may* establish the office of county hearing officer, and that officer *may* be authorized to conduct certain hearings. Appellants have not demonstrated that Stanislaus County has established such an office, or that the county hearing officer was authorized (or required) by ordinance or resolution to conduct the hearing in issue. Appellants assert "[t]here is no evidence in the record that indicates the hearing officer . . . was/is either an attorney or had five (5) years experience as an attorney." Appellants, however, bear the burden of proving that the procedure was improper. " '[T]he burden of proof falls upon the party attacking the administrative decision to demonstrate wherein the proceedings were unfair, in excess of jurisdiction, or showed "prejudicial abuse of discretion." ' " (*Alford v. Pierno* (1972) 27 Cal.App.3d 682, 691 [104 Cal.Rptr. 110].) They have cited no evidence showing that the hearing officer was not a county hearing officer, was not an attorney, or was unqualified in any way. Appellants have not shown that respondent did not proceed in the manner required by law in the selection of a hearing officer or in any other respect.

## II. *Substantial Evidence Supporting the Commissioner's Decision*

"[W]hen the underlying administrative decision does not involve or affect a fundamental vested right, the trial court reviews the entire administrative record to determine whether the findings are supported by substantial evidence and whether the agency committed any errors of law. [Citations.] When considering all relevant evidence within the administrative record, the trial court cannot lose sight that it is for the administrative agency to weigh the preponderance of conflicting evidence, as the court may reverse an administrative decision only if, based on the evidence before the administrative entity, a reasonable person could not have reached the conclusion reached by that agency." (*Ryan v. California Interscholastic Federation-San Diego Section, supra,* 94 Cal.App.4th at p. 1077.) On appeal, the appellate court also must determine whether substantial evidence supports the administrative decision. (*Ibid.*) "Where a factual finding is challenged on the ground there is no substantial evidence to sustain it, the power of the reviewing court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, that will support the administrative agency's determination. [Citation.]" (*Id.* at pp. 1077–1078, fn. 21.) The court must consider all the evidence, including that which fairly detracts from the evidence supporting the agency's decision. (*California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 586 [128 Cal.Rptr.2d 514].)

Appellants were charged with violation of Food and Agricultural Code section 12973, which provides: "The use of any pesticide shall not conflict with labeling registered pursuant to this chapter which is delivered with the pesticide or with any additional limitations applicable to the conditions of any permit issued by the director or commissioner."

The pesticide labels stated: "Do not apply this product in a way that will contact workers or other persons, either directly or through drift." The $5,000 fine was imposed pursuant to California Code of Regulations, title 3, section 6130, which provides, in part:

"(a) When taking civil penalty action pursuant to section 12999.5 of the Food and Agricultural Code, county agricultural commissioners shall use the provisions of this section to determine the violation class and the fine amount.

"(1) For purposes of this article, violations shall be designated as 'Class A,' 'Class B,' and 'Class C.'

"(A) Class A: Violations which created an actual health or environmental hazard . . . . The fine range for Class A violations is $700–$5,000 . . . ."

Appellants contend the violation was not proven because there was no evidence that the label on the pesticide (as opposed to the pesticide itself) was "registered pursuant to this chapter" and a "substantial drift" of pesticide was required in order to establish the violation, but there was no credible evidence of a substantial drift. They also assert the fine amount was not supported by the evidence, because there was no substantial, credible evidence that the spray or drift of the pesticide "created an actual health or environmental hazard."

## A. *Label registration*

In arguing that the labeling was not "registered," as that term is used in Food and Agricultural Code section 12973, appellants do not cite any state statutes or regulations relating to the labeling or registration of pesticides. A review of the applicable statutes is instructive.

 "Every manufacturer of, importer of, or dealer in any pesticide . . . shall obtain a certificate of registration from the department before the pesticide is offered for sale." (Food & Agr. Code, § 12811.) Each applicant for a certificate of registration must identify every pesticide it intends to manufacture or sell and its ingredients. (Food & Agr. Code, § 12821.) The registrant must attach to each container or package of pesticide to be sold a plainly printed label identifying the pesticide and the registered manufacturer, importer, or vendor. (Food & Agr. Code, § 12851.) "The registrant of any pesticide that is sold or delivered to a consumer in this state shall furnish printed directions for use, and dilution if any, upon the label, or shall enclose the printed directions in each container or package of the pesticide." (Food & Agr. Code, § 12852.) "If a manufacturer, importer, or dealer in pesticides that applies for registration of pesticides has complied with this chapter and the regulations that are adopted pursuant to it, the director shall register each pesticide that is sought to be registered and issue a certificate of registration to the applicant that authorizes the manufacture and sale of the pesticide in this state." (Food & Agr. Code, § 12815.) The registration expires on December 31 of each year, unless renewed. (Food & Agr. Code, § 12817.)

 Each application for registration of a pesticide product or to amend the labeling of a pesticide product must be accompanied by six copies of the product labeling. (Cal. Code Regs., tit. 3, § 6170.) Label amendments must be approved pursuant to section 6170 of the regulations, but they are not subject to separate registration renewal requirements. (Cal. Code Regs., tit. 3,

§ 6215.) "No label may represent a registered pesticide and no supplemental or associated information, whether written or oral, may represent a registered pesticide until such label and information is accepted by the director as part of the labeling." (Cal. Code Regs., tit. 3, § 6238.) ▮ The labeling requirements imposed by the director's regulations must meet, but may not exceed, the current United States Environmental Protection Agency (U.S. EPA) labeling requirements; the director's labeling requirements apply equally to pesticides registered by the U.S. EPA and submitted to the director for registration, and those requiring registration only pursuant to Food and Agricultural Code section 12811. (Cal. Code Regs., tit. 3, § 6243.)[5] The assigned registration number must appear on the label—the U.S. EPA registration number if one has been assigned, or the state registration number if no federal number has been assigned. (Cal. Code Regs., tit. 3, § 6241.)

▮ Contrary to appellants' contention, there is no requirement that the labeling of a pesticide be registered separately from the pesticide in order to qualify as "labeling registered pursuant to this chapter" under Food and Agricultural Code section 12973. The pesticide and label are submitted together for registration; the approved label that accompanies a registered pesticide constitutes the "labeling registered pursuant to this chapter" for purposes of that statute. (Food & Agr. Code, § 12973.)

▮ Appellants concede they "never questioned that the 'product' or the 'pesticide' was registered." It is unlawful to use or possess a pesticide that is not registered. (Food & Agr. Code, § 12995.) The parties stipulated that appellants applied Dimethoate to the property adjacent to Ruiz's property, "as noted in Exhibit 15 and 17." Exhibits 15 and 17 indicate the Dimethoate was applied pursuant to the recommendation of a pest control adviser, Dave Vermeulen of Western Farm Services.[6] Both the recommendation (exhibit 15) and appellants' pesticide use report (exhibit 17) reflect the registration numbers of the pesticides applied. The Dimethoate and Warrior labels presented at the hearing bear an EPA registration number. Those labels were

---

[5] This regulation is consistent with federal law. Under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) (7 U.S.C. § 136 et seq.), a state that regulates a federally registered pesticide "shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." (7 U.S.C. § 136v(b).)

[6] " 'Agricultural pest control adviser' means any person who offers a recommendation on any agricultural use, who holds himself or herself forth as an authority on any agricultural use, or who solicits services or sales for any agricultural use." (Food & Agr. Code, § 11410.) " 'Recommendation' means the giving of any instruction or advice on any agricultural use as to any particular application on any particular piece of property . . . ." (Food & Agr. Code, § 11411.) A pest control adviser must be licensed. (Food & Agr. Code, § 12001.)

admitted at the hearing without objection from appellants. Appellants do not now contend the pesticides were not registered. There was no need to present evidence that the labeling was registered separately from the registration of the pesticide. There was no dispute that the pesticides, with the labeling presented, were registered. This satisfied the requirement of "labeling registered pursuant to this chapter" found in Food and Agricultural Code section 12973.

### B. *Underground regulation*

Appellants seem to contend the labeling on the pesticide was an "underground regulation" pursuant to which it was improper to impose a penalty. "An underground regulation is a regulation that a court may determine to be invalid because it was not adopted in substantial compliance with the procedures of the Administrative Procedure Act (Gov. Code, § 11340 et seq.) (APA). [Citation.] To be deemed an underground regulation, [the purported regulation] must meet two requirements: (1) the agency must intend it to apply generally rather than in a specific case; and (2) the agency must adopt it to implement, interpret, or make specific the law enforced by the agency. [Citation.]" (*Modesto City Schools v. Education Audits Appeal Panel* (2004) 123 Cal.App.4th 1365, 1381 [20 Cal.Rptr.3d 831].) Appellants, however, were penalized for violation of a state statute. That statute makes it a violation of state law to use a pesticide in conflict with its registered labeling. The labeling is not intended to apply generally rather than to a specific pesticide; it is not approved or registered to implement, interpret, or make specific the law enforced by the agency. Rather, the labeling is intended to accurately inform the user of the purposes for which the pesticide may be used, the manner in which it may be used, and the hazards involved in its use. Consequently, appellants were not subjected to a penalty pursuant to an underground regulation.

### C. *Substantial drift*

Appellants were charged with using a pesticide in conflict with its labeling. (Food & Agr. Code, § 12973.) The labeling prohibited use "in a way that will contact workers or other persons, either directly or through drift." Appellants point out that Food and Agricultural Code section 12972 provides: "The use of any pesticide by any person shall be in such a manner as to prevent substantial drift to nontarget areas." They assert some amount of drift is

unavoidable and a violation of Food and Agricultural Code section 12973 should not be found unless there is "substantial drift" outside the target area. They contend there was insufficient evidence of a "substantial drift."

The hearing officer found: "Substantial amounts of the pesticides Warrior and Dimethoate did drift from the target site onto the complainant and her property . . . ." He concluded that, although the labels on the pesticides "caution[ed] against any drift without qualification as to amount," in this case the drift was substantial, and would violate both section 12972 and section 12973 of the Food and Agricultural Code. In support of his finding, he cited Ruiz's "credible" testimony that she heard a plane and was enveloped by a fog from the plane, her medical records documenting symptoms and a diagnosis of exposure to the pesticides, and laboratory analyses showing residues of the pesticides on tree leaves and other surfaces in Ruiz's backyard.

Appellants contend that Government Code section 11425.50 required the hearing officer to state the basis on which he ascribed credibility to Ruiz's testimony. Section 11425.50 provides, in part: "If the factual basis for the decision includes a determination based substantially on the credibility of a witness, the statement shall identify any specific evidence of the observed demeanor, manner, or attitude of the witness that supports the determination, and on judicial review the court shall give great weight to the determination to the extent the determination identifies the observed demeanor, manner, or attitude of the witness that supports it." (Gov. Code, § 11425.50, subd. (b).) The hearing officer referred to Ruiz's testimony as "credible," without identifying any evidence of demeanor, manner, or attitude supporting that conclusion. Accordingly, the hearing officer's determination of credibility is not entitled to the "great weight" prescribed by section 11425.50, subdivision (b). (*California Youth Authority v. State Personnel Bd., supra,* 104 Cal.App.4th at pp. 595–596.)

Ruiz testified that, on September 2, 2005, she had gone outside to take her dog out to go to the bathroom, when all of a sudden she was "totally drenched," "totally wet," and "in a fog." She heard the plane, but did not see it. It happened "[p]retty quickly" after she went out, before the dog even finished going to the bathroom. She could not breathe and went inside. She called the hospital and was told to shower right away; she showered, then called the hospital again. She was told to find out what she had been sprayed with; she called Patterson and was told it was Warrior and Dimethoate. Ruiz's eyes were burning and her throat "is still killing me." She went to the hospital emergency room, complaining of cough, shortness of breath, and her

throat closing up, from being sprayed by a crop duster. She was given atropine, which is listed on the Dimethoate label as an antidote to cholinesterase inhibition, which may be caused by Dimethoate. She went back to the emergency room the next day complaining of diarrhea, sore throat, and chest burning.

On September 6, 2005, Ruiz reported the incident to Joe Duchla, a senior agricultural inspector III with the Stanislaus County Agricultural Commissioner's office, who went out to investigate. He took samples of leaves from a tree and a swab from a stainless steel vat close to where Ruiz was standing at the time she was sprayed and had it analyzed. The laboratory results came back positive; they showed 0.31 parts per million (ppm) of Warrior and 0.26 ppm of Dimethoate on the tree leaves, and 0.25 micrograms of Dimethoate and no Warrior in the sample from the vat. Duchla had no explanation for the absence of Warrior from the vat sample. Kevin Gonsalves, deputy agricultural commissioner, opined that the pesticide residue reflected in the laboratory results was substantial, and exposure through an eye, skin, or inhalation could result in Ruiz's symptoms; he noted that the samples were taken six days after the application of the pesticide. The Dimethoate label states: "May be fatal if swallowed. May cause eye injury. Harmful if absorbed through skin. Harmful if inhaled. May cause irritation of the nose and throat. Do not get into eyes. Avoid breathing the vapor or spray mist."

Chris Trinkle testified that "you can't spray without drift." He stated the drift was insubstantial because "I don't think that .3 parts per million is very much of anything." He pointed out that there were no blood tests showing that Ruiz was affected by the pesticides, or that her cough and shortness of breath were symptoms of Dimethoate poisoning rather than something else. He circled the field before beginning his spraying and did not see Ruiz or her dog. He argued it was "her word against mine that she was actually sprayed."

Trinkle's testimony that he did not see Ruiz was not necessarily inconsistent with Ruiz's testimony that she was exposed to drift or spray from his pesticide application, in light of her testimony that the exposure occurred "[p]retty quickly" after she came out of her house. Although, as appellants point out, there was no evidence of blood tests confirming Ruiz's exposure to the pesticides, there was sufficient evidence in her testimony, the medical records reflecting her treatment for cough, shortness of breath, and other symptoms immediately after her exposure, and the pesticide residue found on her property days later to give rise to an inference that her symptoms were caused by exposure to the pesticides.

Considering all the evidence presented, both supporting and detracting from the commissioner's decision, there was substantial evidence to support the hearing officer's finding that there was substantial drift from the target site, and his conclusion that appellants applied the pesticides in conflict with the proscription in their labeling against applying them "in a way that [would] contact . . . persons, either directly or through drift."

### D. *Creation of an actual health or environmental hazard*

Appellants contend the $5,000 fine was not justified, because there was no substantial, credible evidence that the spray or drift of the pesticide "created an actual health or environmental hazard." (Cal. Code Regs., tit. 3, § 6130, subd. (a)(1)(A).) The same evidence described previously supports the commissioner's findings that Ruiz was exposed to the pesticides Warrior and Dimethoate through substantial drift off target, and that she experienced symptoms and suffered health effects as a consequence of that exposure. Substantial evidence supports the commissioner's finding that Ruiz suffered actual adverse health effects from her exposure to the pesticides. The findings support the conclusion that appellants' application of the pesticides "created an actual health . . . hazard," justifying the penalty assessed. (*Ibid.*)

Appellants argue that Ruiz's testimony was not credible, because the pesticides were applied in such small amounts that they could not have harmed her; they contend the medical records are not reliable evidence because Ruiz's treatment was based only on her reported symptoms and her statement that she was sprayed by a crop duster, not on any blood tests showing the cause of her symptoms. It is the province of the administrative agency conducting the hearing to weigh the evidence; this court may only determine whether substantial evidence supports its findings and conclusions. (*Ryan v. California Interscholastic Federation-San Diego Section, supra,* 94 Cal.App.4th at p. 1077.) Substantial evidence supports the findings of the commissioner and the conclusion that the spray or drift of the pesticide "created an actual health or environmental hazard." (Cal. Code Regs., tit. 3, § 6130, subd. (a)(1)(A).) The commissioner was therefore authorized to impose the maximum penalty of $5,000. Appellants do not challenge his exercise of discretion in choosing the penalty.

## *DISPOSITION*

The judgment is affirmed. Costs on appeal are awarded to the Department of Pesticide Regulation.

Gomes, Acting P. J., and Dawson, J., concurred.

A petition for a rehearing was denied April 18, 2008.